## THE VALENCIA.[1]

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE
SECOND CIRCUIT.

No. 51.   Submitted May 7, 1896. — Decided February 1, 1897.

One furnishing supplies or making repairs on the order simply of a person
acquiring the control and possession of a vessel under a charter party
requiring him to provide and pay for all the coals, etc., cannot acquire a
maritime lien if the circumstances attending the transaction put him on
inquiry as to the existence and terms of such charter party, and he fails
to make the inquiry, and chooses to act on a mere belief that the vessel
will be liable for his claim.

The case is stated in the opinion.

*Mr. Frederic R. Coudert* and *Mr. Joseph Kling* for ap-
pellants.

*Mr. William W. Goodrich* and *Mr. John A. Deady* for
appellees.

Mr. Justice Harlan delivered the opinion of the court.

This case is before us upon a question certified by the

---

[1] The docket title of this case is "The Steamship Valencia, her tackle,
etc. William G. Boulton *et al.*, Claimants, *v.* William H. Ziegler *et al.*"

United States Circuit Court of Appeals for the Second Circuit under the act of March 3, 1891, c. 517, 26 Stat. 826.

The facts out of which the question arises are as follows: Upon orders given by the New York Steamship Company, a New Jersey corporation engaged in business at the city of New York, the libellants at different times, at that port, furnished and delivered coal on board of the steamship Valencia for its specific use. The vessel was registered at Wilmington, North Carolina, but was owned by citizens of New York. The coal was necessary to enable it to make a series of regular trips from New York to and from the ports of Maine. In some instances the orders for the coal were sent direct by mail; in others, through a broker, either by the general manager of the company or by the superintendent of the dock. The libellants began to supply the coal on the 30th day of April, 1890, and furnished, from time to time down to and including July 5th, six cargoes, bills for which were sent to the office of the steamship company in the city of New York, and were paid by it.

None of the coal was delivered by the order of the master or by his procurement or with his expressed consent.

The corporation operated the steamship under a charter requiring it "to provide and pay for all the coals," etc. The libellants were not aware of the existence of the charter at the time they furnished the coal, nor did they know where the ship hailed from, whether she was foreign or domestic, nor what was her credit. They were at the time without knowledge of the ownership of the vessel or of the relations between it and the New York Steamship Company, except that that company "appeared to be directing its operation." They made no inquiry as to the solvency of the steamship company, or as to the ownership or nationality of the vessel, but, in the belief that the ship was responsible for supplies furnished, delivered the coal as above stated, charging the same on its books to "S. S. Valencia and owners, New York," in some cases "city," in others "Pier 49, E. R., New York."

No fact proved in the case warranted the inference that

either the master or the charterer agreed to pledge the credit of the vessel for the coal.

By the laws of New York (c. 482 of 1862) it is provided: "§ 1. Whenever a debt amounting to fifty dollars or upwards as to a seagoing or ocean-bound vessel . . . shall be contracted by the master, owner, charterer, builder or consignee of any ship or vessel, or the agent of either of them, within this State for either of the following purposes: 1st. On account of work done or materials or other articles furnished in this State for or towards the building, repairing, fitting, furnishing or equipping such ship or vessel; 2d. For such provisions and stores furnished within this State as may be fit and proper for the use of such vessel at the time the same were furnished, . . . such debt shall be a lien upon such vessel, her tackle, apparel and furniture," etc. No lien was filed under the statute of the State.

Libellants insisted that for other supplies of coal of the aggregate value of $1608.75, furnished in the months of June, July and August, they were entitled to a maritime lien on the ship. The District Court having sustained their claim, an appeal was prosecuted to the Circuit Court of Appeals.

The question certified to this court is: Whether, upon the above facts, the libellants obtained a maritime lien on the steamship for the supplies thus furnished and not paid for.

In *The Kate*, decided at the present term — in which case the libellant claimed a maritime lien on a vessel for coal furnished upon the order of a charterer who was bound by the charter party to provide and pay for all coal required by the vessel — this court said: "The principle would seem to be firmly established that when it is sought to create a lien upon a vessel for supplies furnished upon the order of the master, the libel will be dismissed if it satisfactorily appears that the libellant knew, or ought reasonably to be charged with knowledge, that there was no necessity for obtaining the supplies, or, if they were ordered on the credit of the vessel, that the master had at the time in his hands funds which his duty required that he should apply in the purchase of needed sup-

plies. Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the master upon the owner, or in some breach of the master's duty to the owner, of which the libellant had knowledge, or in respect of which he closed his eyes, without inquiry as to the facts." Again: "If no lien exists under the maritime law, when supplies are furnished to a vessel upon the order of the master, under circumstances charging the party furnishing them with knowledge that the master cannot rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the master, but upon that of the charterer who did not represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them." 164 U. S. 458, 469, 470.

The libellants contend that although the coal was furnished on the order of the charterer, and not on that of the master, they have a maritime lien on the vessel to secure their claim, and cite in support of that view, *The Grapeshot*, 9 Wall. 129, *The Lulu*, 10 Wall. 192, 196, *The Kalorama*, 10 Wall. 204, 210, 213, 214, and *The Patapsco*, 13 Wall. 329.

In *The Grapeshot*, it was said, among other things, that "where proof is made of necessity for the repairs or supplies, or for funds raised to pay for them by the master, and of credit given to the ship, a presumption will arise, conclusive, in the absence of evidence to the contrary, of necessity for credit"; in *The Lulu*, that "experience shows that ships and vessels employed in commerce and navigation often need repairs and supplies in course of a voyage, when the owners of the same are absent, and at times and places when and where the master may be without funds, and may find it impracticable to communicate seasonably with the owners of the vessel upon the subject," and that "contracts for repairs and supplies, under such circumstances, may be made by the

master to enable the vessel to proceed on her voyage, and if the repairs and supplies were necessary for that purpose, and were made and furnished to a foreign vessel or to a vessel of the United States in a port other than the port of the State where the vessel belongs, the *prima facie* presumption is that the repairs and supplies were made and furnished on the credit of the vessel, unless the contrary appears from the evidence in the case"; and in *The Kalorama* — in which case all the advances were made at the request of the master, in the absence of the owner, or by the owner in person when he was present; and with the understanding that they were made on the credit of the vessel — that "the necessity for credit must be presumed where it appears that the repairs and supplies were ordered by the master, and that they were necessary for the ship, unless it is shown that the master had funds or that the owner had sufficient credit, and that the repairers, furnishers and lenders of the money knew those facts or one of them, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry, and to show that if they had used due diligence they would have ascertained that the master was not authorized to obtain any such relief on the credit of the vessel."

These were cases of supplies furnished on the order of the master, and what was said by this court must, therefore, be taken in the light of the principle, that as the master of the ship stands in the position of agent or representative of the owners, the latter "are bound to the performance of all lawful contracts made by him, relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use," *The Aurora*, 1 Wheat. 96, 101; or, as expressed in *The St. Jago de Cuba*, 9 Wheat. 409, 416, the law maritime, in order that the ship may get on, "attaches the power of pledging or subjecting the vessel to material men, to the office of shipmaster; and considers the owner as vesting him with those powers by the mere act of constituting him shipmaster." Upon this ground, as was said in *The J. E. Rumbell*, 148 U. S. 1, 9, maritime liens or privileges for necessary advances

made or supplies furnished in good faith to the master in a foreign port, to keep a vessel fit for sea, " are preferred to a prior mortgage, or to a forfeiture to the United States for a precedent violation of the navigation laws." The relations of the master to the vessel and its owners, as well as to shippers of cargo, are such that his power and duty of determining what part of the common adventure shall be sacrificed for the safety of the rest, and when and how the sacrifice shall be made, were held in *Ralli* v. *Troop*, 157 U. S. 386, 400–1, to appertain to him " *magister navis*, as the person intrusted with the command and safety of the common adventure, and of all the interests comprised therein, for the benefit of all concerned, or to some one who, by the maritime law, acts under him or succeeds to his authority."

In the case of *The Patapsco* it appeared that the supplies were furnished to the vessel in a foreign port. This court, recognizing the case to be an embarrassing one and not free from difficulty, proceeded on the ground that, as according to the weight of the evidence the supplies were furnished on the credit of the ship, and not on that of the company which used it, and which was notoriously insolvent, there was a lien on the vessel that should not be displaced except upon affirmative proof that the credit was given to the company to the exclusion of the vessel. Nothing, however, was said in that case to justify the contention that a lien will arise for necessary supplies furnished a vessel, in a foreign port, on the order of a charterer, if the libellant at the time knew, or by reasonable diligence could have ascertained, that it was being run under a charter that obliged the charterer to provide and pay for all needed supplies. That case turned largely upon its special facts, and was so presented to this court as to restrict its inquiry to the single point whether the coal was furnished to the Patapsco on the credit of the vessel or of the owners. In point of fact, the Patapsco was run under a charter party by the Commercial Steamboat Company, a corporation of Rhode Island. But that corporation owned and operated steamers of its own on the same line in which the Patapsco was employed; and the court in examining the case seemed to have

treated that company as the owner of all the vessels used on its line. This is apparent from the opinion, which states that " whether the coal was furnished on the credit of the vessel or of the owners is the only point of inquiry in this case."

Nor is there anything in *The Guy*, 9 Wall. 758, which bears directly on the question, now presented. The opinion was very brief and stated nothing more than that upon the facts established that case was governed by the principles announced in *The Grapeshot*, decided at the same term. According to the reporter's statement of the facts it was a case of repairs ordered by one claiming to be the proprietor and agent of the company operating the vessel, and who "seemed to have been the owner." It was substantially the case of necessary repairs made pursuant to an agreement or understanding with the owner that they were made on the credit of the vessel, the owner himself being known to be insolvent and unworthy of credit.

In the present case, the question of lien or no lien on the vessel arises under circumstances not disclosed or discussed in any of the cases upon which libellants rely. Although the libellants were not aware of the existence of the charter party under which the Valencia was employed, it must be assumed upon the facts certified that by reasonable diligence they could have ascertained that the New York Steamship Company did not own the vessel, but used it under a charter party providing that the charterer should pay for all needed coal. The libellants knew that the steamship company had an office in the city of New York. They did business with them at that office, and could easily have ascertained the ownership of the vessel and the relation of the steamship company to the owners. They were put upon inquiry, but they chose to shut their eyes and make no inquiry touching these matters or in reference to the solvency or credit of that company. It is true that libellants delivered the coal in the belief that the vessel, whether a foreign or a domestic one, or by whomsoever owned, would be responsible for the value of such coal. But such a belief is not sufficient in itself to give a maritime lien. If that belief was founded upon the supposition that ·

the steamship company owned the vessel, no lien would exist, because in the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made "on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived." *The St. Jago de Cuba*, 9 Wheat. 409, 416, 417. And if the belief that the vessel would be responsible for the supplies was founded on the supposition that it was run under a charter party, then the libellants are to be taken as having furnished the coal at the request of the owner *pro hac vice*, *Stephenson* v. *The Francis*, 21 Fed. Rep. 715, 717, *The Samuel Marshall*, 54 Fed. Rep. 397, 399, without any express agreement for a lien, and in the absence of any circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred. In the present case, we are informed by the record that there was no express agreement for a lien, and that nothing occurred to warrant the inference that either the master or the charterer agreed to pledge the credit of the vessel for the coal.

In *Beinecke* v. *Steamship Secret*, 3 Fed. Rep. 665, 667, United States District Court for the Southern District of New York, which was a suit against a vessel owned by a foreign corporation having an office and transacting business in New York, and with good credit there, but operated by Murray, Ferris & Co., a New York firm, under a charter party requiring the charterers to furnish all supplies, Judge Choate said: "They [the libellants] knew they were dealing with New York parties, and not with the foreign owner or the master, who presumably represents the owner; and they were put upon inquiry as to the interest and relation of Murray, Ferris & Co. to the vessel, and are chargeable with the facts they might have ascertained on such inquiry. They could easily have learned that Murray, Ferris & Co. had no right or power to bind the owners or the vessel for the supplies, and that they were, in fact, the owners, so far as concerned parties supplying the ship." So, in *The Norman*, 28 Fed. Rep. 383, 384, Judge McKennan said: "But Murray, Ferris & Co. [the

charterers] were residents of New York, at which port the vessel was lying when the coal was furnished, and they furnished it directly, without the intervention of the official representative of the vessel. They were owners *pro hac vice*, because they had possession of the vessel, and she was at their "sole disposal" until the end of the charter. These facts repel the implication that the coal was furnished upon the credit of the vessel, but warrant the inference that it was furnished upon the personal credit of the charterers and ostensible owners. At least they were sufficient to put the libellant upon inquiry as to the actual relations of Murray, Ferris & Co. to the vessel, and their obligations under the charter party; and this must have resulted in the knowledge that the act of the charterers could not, under the circumstances, impose a lien upon the vessel." In *The Samuel Marshall*, 49 Fed. Rep. 754, 757, affirmed in 6 U. S. App. 389, Judge Severens said: "If the vessel is then in the use, possession and control of others than the owner, a presumption arises that such others are liable to pay the charges incident to the employment; and if the party furnishing the supplies knew, or should have known, the facts in regard to the use and control of the vessel, there is the same reason for the presumption against the credit being given to the vessel, when the charterer or other person standing in a similar relation to the vessel resides at the port of supply, as in cases where the owner operating the vessel on his own account resides at such port, and 'where there is the same reason there should be the same law.'" See also *The Suliote*, 23 Fed. Rep. 919; *The Pirate*, 32 Fed. Rep. 486; *The Glenmont*, 34 Fed. Rep. 402; *The Golden Gate*, 1 Newberry, 308.

Under what circumstances, if under any, a charterer who has control and possession of a vessel under a charter party requiring him, at his own cost, to provide for necessary supplies and repairs, may pledge the credit of the vessel, it is not necessary now to determine. We mean only to decide, at this time, that one furnishing supplies or making repairs on the order simply of a person or corporation acquiring the control and possession of a vessel under such a charter party can-

not acquire a maritime lien if the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party, but he failed to make inquiry, and chose to act on a mere belief that the vessel would be liable for his claim.

*For the reasons stated the question certified to this court is answered in the negative.*