# THE POST STEAMBOAT COMPANY
## *v.*
# LOUGHRAN.

---

## SAME *v.* GOLDEN.

---

## SAME *v.* LYNAH.

---

ADMIRALTY LAW; MARITIME LIENS FOR SUPPLIES; CHARTER PARTY; NOTICE; PRINCIPAL AND SURETY.

1. Where persons furnish coal or other supplies to a steamer enrolled at another port, but under charter by a corporation having its principal offices at the port of supply, which charter makes the charterer liable for supplies furnished the vessel, such persons have no lien upon the vessel for the supplies furnished by them, if they have notice of the charter party, or might by reasonable diligence have acquired notice of it.

2. A bank advancing money to a corporation, which is the charterer of a vessel under a charter party making the charterer liable for supplies furnished, is chargeable with notice of such charter party, and has no lien against the vessel for such advances, where the cashier of the bank is the treasurer of the corporation; and vouchers for supplies, taken up at the bank by money advanced to the corporation, can not be made the foundation, by subrogation or otherwise, of a claim for a maritime lien against the vessel.

3. Nor can an officer of the bank acquire any right to such a lien by transfer of the bank's claim.

4. An assignee of the surety on a bond given by the charterer of a vessel to the owners, to perform the conditions of the charter party, one of which is to guarantee the vessel and its owners against debt for supplies, has no lien for coal furnished the vessel.

Nos. 689, 690 and 691. Submitted November 5, 1897. Decided April 4, 1898.

HEARING on three appeals by the owners of a vessel, libeled for money advanced and supplies furnished, from decrees declaring liens against the vessel in favor of the libelants. *Two appeals reversed and one affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. S. F. Phillips* and *Mr. Frederic D. McKenney* for the appellant:

1. An obligor in a bond with condition to protect a chartered vessel against maritime liens for supplies, etc., is disabled from such lien himself, and so, consequently, is any assignee of his.

The face of the bond indicates plainly that it was given by way of substitution for the one specially described in the charter, and not in order to secure the execution of such bond; and consequently, by elementary principles of law, a court which administers, as does a court of admiralty, equitable principles, will not permit Chapman or an assignee of his or any other suitor therein to take with one hand that which with the other he would have to restore. 10 Am. & Eng. Encyc. L. 411; *Trustees* v. *Heise,* 44 Md. 453.

2. Ordinarily, parties dealing in supplies, etc., with charterers or vessel, with notice of a charter, whether express or implied, are not entitled to a maritime lien. *The Kate,* 164 U. S. 458; *The Valencia,* 165 U. S. 264.

3. Under the general circumstances of this case—*i. e.,* the recent and first appearance of the vessel at Washington at the opening of the excursion season of 1896, the impecunious condition of the Chesapeake and Potomac Steamboat Company and the other parties who introduced it there and were charged with its management, the plain lettering and other marks upon it showing that it belonged to the port of New York, etc., put Washington banks and merchants upon inquiry as to its relations to such company and managers, and upon notice that it was not owned by them, but at most was under charter.

4. Notice of the existence of the charter in this case included notice of all provisions in it which inquiry would have shown.

5. Such notice included a notice that the charterer and its agents could not create an express lien upon the vessel.

*Mr. E. H. Thomas, Mr. Percival M. Brown, Mr. S. T. Thomas, Mr. Montgomery Blair, Mr. Joseph Shillington* and *Mr. A. E. Shoemaker* for the appellees:

1. If it be admitted that the libelants had express notice of the very terms of the charter, they were notified by it that the charterer was the agent of the owners and had authority to pledge the credit of the vessel. There was no demise of the vessel, and the foreign owners never really parted with her possession. There was no inhibition preventing the charterer from pledging the vessel, either by express contract or by implication of law. Even if, by legal construction, there was a demise and such inhibition, yet, because of the doubtful meaning of the charter, material men with knowledge of the very terms thereof were entitled to assume the charterer had authority to pledge the vessel. See *Renard* v. *Lampson,* 2 Kern. 561; *Putnam* v. *Wood,* 3 Mass. 485; *Steel* v. *Lester,* 3 C. P. D. 121; *Certain Logs of Mahogany,* 2 Sumn. 589; *Reed* v. *United States,* 11 Wall. 591.

2. The general manager of the charterer was, in all other respects than those of pilot or navigator, practically "master" of the boat. The law therefore constituted Fletcher (and his agents) master. *The Havana,* 26 U. S. App. 236, a case directly in point; *The Gracie May,* 38 U. S. App. 223; *The Aeronaut,* 36 Fed. R. 499; *The Sarah Harris,* 13 Blatchford, 503, all cases from the second circuit, on which the *Kate* and *Valencia* were tried and determined as in the Supreme Court.

3. For necessary repairs or supplies furnished to a vessel in a foreign port, a lien is given by the general maritime law, following the civil law, and may be enforced in admiralty. *The Rumbell,* 148 U. S. 1. That the ports of States other than those of the State where the vessel belongs are foreign ports is also well established. *The Lulu,* 10 Wall. 192, 197. The general rule, where necessity for repairs,

etc., is shown, is that the vessel is liable, if she be in a foreign port, without express contract. *The Rumbell, supra.* If the vessel be demised by charter and by its terms the charterer is to provide repairs, etc.; and if the repairs be made on the credit of the charterer alone; or, if not chartered, solely on the credit of the owner; or, if chartered, and supplies be furnished under circumstances which charge the libelant with knowledge of the terms of the charter, there is no lien implied. But if the libelant is only charged with knowledge of the fact that the vessel is operated under a charter party, then the vessel is liable. *The Kate,* 164 U. S. 458. If the supplies are necessary, and are ordered by the master or proper agent of the foreign boat, the presumption is that they were furnished on the credit of the ship, and the burden of rebutting this presumption is on the claimants of the boat. *The Emily B. Souder* v. *Pritchard,* 17 Wall. 666; *The Patabsco* v. *Boyce,* 13 Wall. 329; *Insurance Co.* v. *Baring,* 20 Wall. 159; *The Virgin* v. *Vyfhius,* 8 Pet. 538.

Where the general owner of a vessel charters it, and allows the charterer to have control, management and possession of the vessel, and thus to become the owner for the voyage, he must be deemed to consent to a lien for necessary supplies, furnished in a foreign port, for the prosecution or completion of the voyage. *The City of New York,* 3 Blatch. 187; *The Stroma,* 14 Fed. R. 599; *The India,* 16 Fed. R. 262. The "John Sylvester" was owned in New York, and the supplies were furnished her at Washington, which was a foreign and not her home port. *The Havana,* 54 Fed. R. 201; *The George Dumois,* 68 Fed. R. 926; *The Gracie May,* 72 Fed. R. 283.

4. There is no proof in the record, on behalf of the claimant, that the master or agent ordering the supplies in this case, was in funds sufficient to pay therefor; that the material men either had notice of these facts, or knowledge of facts sufficient to put them on inquiry; and that reasonable inquiry or due diligence would have informed them of the

existence of such funds, and that there was no need of credit. *The Belfast*, 7 Wall. 624; *The Lulu*, 10 Wall. 192; *The Emily Souder*, 17 Wall. 666; *The Patapsco*, 13 Wall. 329. On the contrary, the evidence shows conclusively that the charterer who owned the vessel *pro hac vice* was a non-resident corporation and was without funds.

5. An examination of the cases of *The Kate*, 164 U. S. 458, and *The Valencia*, 165, 264, will show that the following principles are established by these cases: (1) The master of a vessel in a foreign port without funds in the absence of the owner may pledge the vessel when necessity arises. (2) A foreign port is a port in the United States other than the port of the State where the vessel belongs. (3) The necessity for credit will be presumed unless the master had funds, or the owner sufficient credit. (4) The owner *pro hac vice* may bind the vessel by express contract for a lien under circumstances which justify an inference that supplies were furnished with an understanding that the vessel would be responsible. (5) If advances are made, supplies furnished or repairs made upon the order of the charterer as well as on the credit of the vessel under circumstances which did not charge the libelant with knowledge of the terms of the charter party but charged him only with knowledge of the fact that the vessel was being operated under a charter party, then a maritime lien exists.

6. It is beyond dispute that the owner *pro hac vice* in a foreign port may bind the vessel in two class of cases. (1) By express contract to that effect. (2) Under circumstances which justify an inference that the supplies were furnished or the advances made with an understanding that the vessel would be liable. See *The Alvira*, 63 Fed. R. 144, 154, 155; *The Storma*, 11 U. S. App. 673; *The Aeronaut*, 36 Fed. R. 497; *The Samuel Marshall*, 6 U. S. App. 389; *The Gracie May*, 38 U. S. App. 223.

7. The rule is that a material man has the right to suppose that the owners of the boat live in the State of the port

at which she is enrolled, and therefore her home port is that of the name painted on her stern. *The Samuel Marshall,* 6 U. S. App. 389; *St. Iago de Cuba,* 9 Wheat. 409; *McAllister v. The Kislaman,* 1 Bond, 369; *The Freeman,* 18 How. 182.

8. If, by any possible construction of the provision of the charter party relating to supplies as between the charterers and the owners of the boat, it could be held that an agreement to furnish a bond of an indemnity company was equivalent to personally guaranteeing said debt for supplies, such a construction could not be indulged in with regard to Chapman, the surety on the bond. The liability of the surety is not to be extended by implication beyond the strict terms of his contract. 24 Am. & Eng. Encyc. L. 749. There is no provision in the bond itself to protect the owners of the boat against liens which might be created for supplies, and there is no such provision in the charter party.

Even on a direct and personal undertaking to hold an obligee harmless by reason of liens being enforced against his property, one of several sureties could not be considered to be estopped from asserting a right of lien for material furnished the obligor. He does not agree to assume sole liability to hold the obligee harmless for the whole or any part of a claim, but is entitled to have the extent of the liability determined in an action at law, so that the liability may be fixed and determined in a proper proceeding, and so that the surety if sued apart from principal and cosureties would have a right of action for contribution against cosureties. This right of contribution and many others would be lost by construing his obligation as a surety to the forfeiture of all right to assert his claims against the obligation or bond. Boiset on Mech. Liens, 718.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an admiralty proceeding against the steamer "John Sylvester," belonging to the claimant, the Post Steam-

boat Company, a corporation of the State of New Jersey. The boat was registered at the port of New York, and was chartered by charter party, dated the 15th of May, 1896, to the Chesapeake and Potomac Steamboat Company, a corporation of the State of West Virginia, to be run as an excursion boat on the Potomac River, between the city of Washington, D. C., and Colonial Beach, in the State of Virginia, during the summer season of 1896, the term of the hiring to expire the 15th of September, 1896.

The charterers of the boat were incorporated under the law of the State of West Virginia, and its principal corporate office was established at Martinsburg, in that State. Its principal business office, however, was established in the city of Washington, and in the latter place the principal corporators resided; and while the capital stock of the corporation was allowed to be increased, the subscribed capital stock was but $500, and only $50 of which had been paid in. It was purely an experimental and adventurous enterprise, without capital and with but doubtful prospect of ultimate success. Its corporators and promoters were men of little or no pecuniary resources, and depended alone upon the income of the undertaking for means to pay expenses.

The charter party under which the Chesapeake and Potomac Steamboat Company obtained possession and use of the "John Sylvester," in the excursion business, contained, among others, the following clauses and provisions:

"At the expiration of this charter, the said steamboat shall be delivered to her owners at such dock in Washington or Georgetown as designated by them, (unless lost), in in as good condition as she was delivered to the charterers, ordinary and reasonable wear and tear excepted. . . .

"It being further understood, agreed and provided that, should the charterers at any time fail to fulfill their part of this contract in matter of security, charter payments or for other causes, the owners shall have the right to enter at once into possession of their property without prejudice to

any claim or claims they (the owners) may otherwise have on the charterers, in pursuance of this charter.

"That the charterers agree to furnish to the owners on execution of this charter party, a good and acceptable bond from a guaranty or indemnity company of good standing in the city of New York, for the amount of $12,500 *to guarantee against debt for supplies furnished the vessel,* or for what claim owners may have against the charterers."

The bond referred to in the charter party was given, though not with the surety specified. Instead of a guaranty company of the city of Baltimore or New York, as surety, a bond with personal sureties was substituted, and one of the sureties in this bond was J. Edward Chapman, a coal merchant residing and doing business in the city of Washington.

The steamer was run from Washington City to Colonial Beach, and its supply of coal and all other supplies to meet the requirements of a summer excursion boat, were taken in at Washington; and the materials were supplied by various persons, and they failed to receive the amounts of their bills.

Near the end of the season for which the boat was chartered, there were several original, and a greater number of intervening, libels filed against the steamboat "John Sylvester," some thirteen in all, claiming maritime liens, seeking to have the vessel condemned and sold for the payment of the respective claims. The owners of the steamer, answering the several libels, deny the right of lien in each and all of the several libels filed, and insist that there is no ground for the liens claimed.

There is no question on these appeals as to whether the articles furnished by the several libelants were properly embraced within the definition of necessary supplies, such as were proper and would be required to keep supplied a suitably provisioned excursion boat, running for the pleasure of the public, during the summer season. But the question is, whether the libelants have acted under such circumstances, in the absence of such notice, and upon the exercise

of such reasonable diligence to acquire notice as to the protection of the vessel against liens for supplies under the charter party, as will entitle them to claim a right of lien upon the vessel for supplies furnished, according to the principles of the general maritime law?

After answers filed, the cases were referred to a special commissioner, with directions to take testimony, and to report both as to the law and the facts, as to the respective claims of the libelants. A considerable volume of evidence was taken, for and against the claims, and the commissioner made elaborate reports, both as to the law and the facts, and he reported in favor of the allowance of all the claims, with inconsiderable exceptions, and that the libelants were entitled to liens upon the vessel for the claims so allowed. The reports of the commissioner were all excepted to by the owners and claimants of the vessel; but the exceptions were all overruled by the court below, and decrees were entered confirming the reports, and declaring liens against the steamer for the several amounts reported due to the libelants. It is from these decrees, three in number, that the present appeals are taken by the owners and claimants of the vessel. And as the evidence is all embraced in one record, and much of which is applicable to all the cases, the court below consolidated the appeals so as to avoid the necessity of making up and having printed more than one record for this court, though there are three several decrees and three several appeals entered.

As we have already seen, from the provisions of the charter party recited, the charterers were required, at the end of the term for which the vessel was hired, to deliver it back to the owners in as good condition as it was when delivered to the charterers, ordinary and reasonable wear and tear excepted; and in the event that the charterers should fail to fulfill their part of the contract in matter of security, charter payments, or for other causes, the owners should have the right at once to take possession of their

property, without prejudice to any claim they might have against such charterers; and, further, that by good and sufficient bond, the charterers should guarantee the owners against debts for supplies furnished the vessel, or for what claims owners might have against charterers. The manifest object and purpose of these provisions were not only to furnish security for charter due, but also to protect both the owners and the steamer against claims that might otherwise be enforced by way of lien upon and condemnation of the steamer. With such protective stipulations in the charter party, no person dealing with the charterers or those representing them, in the port where the charterers reside, and furnishing supplies to the vessel, could acquire the right to libel and fix a maritime lien upon it for coal or other supplies, if he had notice of the existence of the charter party and its provisions, or if by the use of reasonable diligence, by making inquiry, he could have acquired knowledge of such charter party. For it is now the settled law that where persons furnish coal or other supplies to a steamer enrolled at another port, but under charter by a corporation having its principal office at the port where the coal or other supplies are furnished, such persons have no lien upon the vessel for such supplies, if they have notice of the charter party, or might, by reasonable diligence, have acquired notice of the charter which makes the corporation holding under the charter liable for the supplies furnished the steamer. This principle was laid down with great distinctness in the case of *The Samuel Marshall*, 49 Fed. R. 754, 757, and affirmed on appeal in 6 U. S. App. 389. In that case it was said by the court: "If the vessel is then in the use, possession and control of others than the owners, a presumption arises that such others are liable to pay the charges incident to the employment; and if the party furnishing the supplies knew, or should have known, the facts in regard to the use and control of the vessel, there is the same reason for the presumption against the credit being

given to the vessel when the charterer or other person. standing in a similar relation to the vessel resides at the port of supply, as in cases where the owner operating the vessel on his own account resides at such port, and where there is the same reason there should be the same law." This case of *The Samuel Marshall* has been quoted and approved by the Supreme Court of the United States, in the recent case of *The Valencia,* 165 U. S. 264, 272.

The whole law upon this subject of furnishing supplies to a vessel in a port other than that in which she is enrolled, and where she is employed under a charter party which provides, as in the one before us, that the charterers shall pay for all supplies furnished to the vessel, to the exoneration of the vessel and its owners, has been fully reviewed and discussed by the Supreme Court of the United States, in two recent cases, the first, that of *The Kate,* 164 U. S. 458, and the second, that of *The Valencia,* 165 U. S. 264. In the first of these cases, the libelant claimed a maritime lien on a vessel for coal furnished upon the order of a charterer who was bound by the charter party to provide and pay for all coal required by the vessel during the charter service, and the court, speaking by Mr. Justice Harlan, said : "Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the master upon the owner, or in some breach of the master's duty to the owner, of which the libelant had knowledge, or in respect of which he closed his eyes, without inquiry as to the facts." And the court then proceeds to say : "If no lien exists under the maritime law, when supplies are furnished to a vessel upon the order of the master, under circumstances charging the party furnishing them with knowledge that the master can not rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the master, but upon that of the charterer who did not

represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them."

In the case of *The Valencia, supra,* the facts were, that upon orders given by the New York Steamship Company, a New Jersey corporation engaged in business at the city of New York, the libelants, at different times, at that port, furnished and delivered coal on board of the steamship "Valencia" for its specific use. The vessel was registered at Wilmington, North Carolina, but was owned by citizens of New York. The coal was necessary to enable it to make a series of regular trips from New York to and from the ports of Maine. The corporation operated the steamship under a charter requiring it "to provide and pay for all the coals," etc. The libelants were not aware of the existence of the charter at the time they furnished the coal, nor did they know where the ship hailed from, whether she was foreign or domestic, nor what was her credit. They were at the time without knowledge of the ownership of the vessel, or of the relations between it and the New York Steamship Company, except that the company "appeared to be directing its operations." They made no inquiry as to the solvency of the steamship company or as to the ownership or nationality of the vessel, but, in the belief that the ship was responsible for the supplies furnished, delivered the coal, as above stated, charging the same on its books to "S. S. Valencia and owners, New York." No fact proved in the case warranted the inference that either the master or the charterers agreed to pledge the credit of the vessel for the coal. And the question presented to the Supreme Court was, whether, upon the facts stated, the libelants obtained a maritime lien on the steamship for the supplies thus furnished and not paid for. And that question was answered in the negative by the Supreme Court.

The question was very fully discussed and many of the previous cases examined. And Mr. Justice Harlan, in delivering the opinion of the court, said:

"In the present case, the question of lien or no lien on the vessel arises under circumstances not disclosed or discussed in any of the cases upon which libelants rely. Although the libelants were not aware of the existence of the charter party under which the 'Valencia' was employed, it must be assumed, upon the facts certified, that by reasonable diligence they could have ascertained that the New York Steamship Company did not own the vessel but used it under a charter party providing that the charterer should pay for all needed coal. The libelants knew that the steamship company had an office in the city of New York. They did business with them at that office, and could easily have ascertained the ownership of the vessel and the relation of the steamship company to the owners. They were put upon inquiry, but they chose to shut their eyes and make no inquiry touching these matters or in reference to the solvency or credit of the company. It is true that libelants delivered the coal in the belief that the vessel, whether a foreign or a domestic one, or by whomsoever owned, would be responsible for the value of such coal. But such a belief is not sufficient in itself to give a maritime lien. If that belief was founded upon the supposition that the steamship company owned the vessel, no lien would exist, because in the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person, is to be taken as made 'on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.' *The St. Iago de Cuba,* 9 Wheat. 409, 416, 417. And if the belief that the vessel would be responsible for the supplies was founded on the supposition that it was run under a charter party, then the libelants are to be taken as having furnished the coal at the request of the owner *pro hac vice* (*Stephenson*

v. *The Francis*, 21 Fed. R. 715, 717; *The Samuel Marshall*, 54 Fed. R. 397, 399), without any express agreement for a lien, and in the absence of any circumstances justifying the inference that the supplies were furnished with an understanding that the vessel itself would be responsible for the debt incurred.  In the present case we are informed by the record that there was no express agreement for a lien, and that nothing occurred to warrant the inference that either the master or the charterer agreed to pledge the credit of the vessel for the coal."

And in the conclusion of the opinion the court said: "Under what circumstances, if under any, a charterer, who has control and possession of a vessel under a charter party requiring him at his own cost to provide for necessary supplies and repairs, may pledge the credit of the vessel, it is not necessary now to determine.  We mean only to decide at this time that one furnishing supplies or making repairs on the order simply of a person or corporation acquiring the control and possession of a vessel under such a charter party can not acquire a maritime lien if the circumstances attending the transaction put him on inquiry as to the existence and terms of such charter party, but he fail to make inquiry, and choose to act on the mere belief that the vessel would be liable for his claim."

Now, with these general principles in view, thus plainly enunciated by the Supreme Court as our guide, we shall proceed to examine the claims of the libelants to maintain maritime liens and to have condemnation of the steamboat "John Sylvester."

1. And, first, we shall examine the claim to lien made by F. A. Seabring, assistant cashier of the Ohio National Bank, for money alleged to have been advanced *on the faith and credit of the vessel*, and not on the credit of the owners and charterers, *or either of them*, for supplies, repairs and wages, in divers sums of money, in the aggregate amounting to the sum of $2,657.03.  But, by the finding of the special

commissioner and the decree of the court below, of this amount only the sum of $1,126.33 was found to be due, and for which the libelant was entitled to a lien upon the vessel. And the question is, whether the lien can be maintained for this latter amount.

The owners and claimants of the steamer, in their answer to the libel, aver that the said William O. Roome, the Ohio National Bank and all persons to whom it is alleged in the libel that the said Ohio National Bank paid or advanced money, as well as the libelant himself, had knowledge of all the facts alleged in the answer relating to the charter party and the terms thereof, and that all the supplies, etc., and moneys advanced or loaned, were furnished, advanced or paid *solely upon the credit* of the charterers of the steamboat "John Sylvester," or were paid out of funds belonging to the said charterers, the Chesapeake and Potomac Steamboat Company, or loaned or advanced to them, and that no credit for any of said purposes was given by said parties to the said steamer.

It is shown in evidence that about the date of the charter party, or perhaps a little before, Fletcher, the agent and general manager of the Chesapeake and Potomac Steamboat Company, applied to the Ohio National Bank to become the treasurer of the company; but that offer being declined, application was then made to Roome, the cashier of the bank, to become the treasurer of the company, and the offer was accepted, and Roome became the treasurer of the company, with the understanding that the bank account or accounts should be kept at the bank of which Roome was cashier. That would seem to have been the main inducement to his becoming the treasurer of the company. With this engagement and understanding, it must necessarily be inferred that, according to the most ordinary business principles, Roome made himself acquainted with and did understand the relation between the owners and the charterers of the steamboat; that he knew full well the

terms and conditions upon which the boat was chartered, and would be employed in the excursion service, and that he knew for what the charterers, his principals, were liable under the charter party. It would be derogatory to the character of Mr. Roome as a business man to suppose that he would occupy the relation that he did to the charterers, without taking sufficient interest in the enterprise to inform himself and acquire the knowledge that is now imputed to him. He in fact, and according to his own account, became the financial agent of the charterer company; and as such he loaned or advanced money himself, and procured advancements to be made by the bank, and all such advancements were placed to the credit of the Chesapeake and Potomac Steamboat Company. The account was kept in the name of that company, and was drawn upon, from time to time, as funds were needed to pay bills. There is literally nothing to indicate that the credit in the bank was given to the steamer "John Sylvester," rather than to the Chesapeake and Potomac Steamboat Company. On the contrary, all the *indicia* of the dealings clearly point to the fact that the transactions were with and the credit given to the charterers, the Chesapeake and Potomac Steamboat Company; and as strong evidence of this, it is shown in evidence, that for money borrowed of the bank notes at different times were given by the Chesapeake and Potomac Steamboat Company to the bank. The vouchers produced in support of the claims set forth in the libel were taken up at the bank by money advanced to the charterers and credited in account, and as it was paid out charged against the credits. The vouchers thus coming to the bank can not be made the foundation, by subrogation or otherwise, of a claim to entitle a party to a maritime lien against the steamer "John Sylvester." The libelant can stand in no better position than the parties who advanced and paid out the money on account of the Chesapeake and Potomac Steamboat Company; and as neither Roome nor the bank could

maintain a lien against the vessel because of the circumstances under which the money was advanced on account of the charterers, it is clear no right to maintain a lien could be transferred to the libelant, an officer in the bank. It is conceded that Roome had knowledge of the fact that the possession and control of the steamer had been obtained under charter party, and the bank, represented by Roome, was equally affected by such knowledge as Roome himself. Good faith throughout is an essential element in the right to maintain a maritime lien; and the effect of notice and the other circumstances that would preclude the right to lien in the original parties can not be overcome by the device of a transfer or assignment of the claim to a third person without recourse.

The decree, therefore, of the 8th of March, 1897, passed in No. 472 by the court below, sitting and exercising the jurisdiction of a District Court of the United States for the District of Columbia, in admiralty, must be reversed, to the extent of disallowing and rejecting the claim of the libelant, Frank A. Seabring, for the aggregate sum of $1,126.33, which was by said decree allowed and declared to constitute a maritime lien on said steamer, the "John Sylvester."

2. Then, as to the libel of Lynah and Read, copartners, for coal supplied to the steamer "John Sylvester," by J. Edward Chapman, the claim for which has been assigned to the libelants.

The libelants allege that, in order to enable the said steamboat to run as aforesaid, it was necessary to use coal, which was furnished by J. Edward Chapman, a dealer in coal in the city of Washington, upon the order of an authorized agent of the steamboat company, and of the steamer "John Sylvester;" and that said coal was furnished on the credit of said steamboat; that the libelants have a right to recover the amount claimed, to wit, the sum of $1,470 for the coal so furnished as aforesaid; and that said amount is a valid maritime lien against said steamboat; that the said

Chapman obtained the coal from the libelants, and that the claim therefor and the said maritime lien against the steamboat, and the right to enforce the same, and to sue for and collect said claim, have been transferred by a valid assignment to the libelants, and that said claim has not been paid or satisfied.

In answer to this libel, the owners and claimants of the vessel denied the right of the libelants to any such lien as claimed, and as special matter of defence, alleged, that on or about the 18th of May, 1896, the charterers, as principals, and the said J. Edward Chapman, with others as sureties, entered into the bond hereinbefore referred to, in and by which the said charter party was made part thereof, and whereby they jointly and severally bound themselves for the performance in all respects to the claimants of all the stipulations, terms, and conditions in said charter party contained; and by which charter party, among other things, it was agreed to guarantee said steamboat and its owners against debt for supplies.

And it was further alleged that the libelants had knowledge of the facts set forth in the answer, and that all the supplies mentioned in the libel as furnished were furnished upon the credit of the said charterers, and not upon the credit of the said steamboat.

As we have seen, Chapman, the assignor of the claims upon which the libel in this case was filed, was one of the sureties in the bond of guarantee to the owners of the vessel; and one of the objects of the bond was to protect the owners and the vessel against liability for supplies furnished to the vessel. The recitals and the condition of the bond refer to and make part thereof the charter party previously executed. Of course, the parties signing the bond must be taken to have had knowledge of the charter party, and all its provisions. Whether this bond should be treated strictly as an estoppel to the sureties therein from making claims for supplies furnished and sought to be charged to the

vessel, in contravention of their guarantee, or whether the liability of the surety should be treated as an equitable set-off to the claim set up by the libel, are questions not material to be decided in this case. But that the bond operated and carried notice to Chapman, of the conditions and stipulations of the charter party, is unquestionable ; and that being so, the case falls fully within the principle of the cases of *The Kate* and *The Valencia,* to which reference has already been made. And Chapman being affected by such notice, the present libelants, his assignees, can not stand in any better position in respect to the claims assigned than Chapman himself, who appears to have become surety in the bond with the view and understanding that he was to have the exclusive right of supplying coal to the vessel. He was thus a promoter of the enterprise.

The decree, therefore, of the court below, of the 11th of March, 1897, passed in the exercise of the jurisdiction of a district court of the United States for the District of Columbia, in admiralty, must be reversed, to the extent that the claims of the libelants therein allowed, that is to say, the claim for $699, and the claim for $713, making in the aggregate the sum of $1,412, must be disallowed and rejected, as not constituting a maritime lien upon the steamboat "John Sylvester."

3. The other eleven libels, original and intervening, are for comparatively small amounts, aggregating, however, the sum of $1,145. The sums allowed on these libels were for proper and necessary supplies furnished to an excursion boat, consisting of food material, liquors, cigars, ice, music, and so forth; and for some small bills for repairs. The claims of some three or four of these libelants, it is true, come very near the line of exclusion as laid down in the case of *The Valencia.* But the parties swear that they furnished the material and performed the services charged for upon the credit of the vessel, and that they did not know of the charter party or of its contents. The special com-

missioner has examined the claims with great care, and the court below, we think, was right in confirming the report of the commissioner in respect to the claims upon which the remaining eleven libels are founded, and that the decrees declaring these claims to be liens upon the steamboat "John Sylvester" ought to be affirmed.

It follows that the decree in No. 689, and also the decree in No. 691, appeals, on the docket of this court, must be reversed in part and affirmed in part, in accordance with the foregoing opinion; and that the decree in No. 690, appeals, on the docket of this court, will be affirmed; all of said decrees and appeals being contained in one record.

The cost of the entire record shall be divided into three equal parts—one of said parts apportioned to each of the three appeals. The one-half of the one-third apportioned to No. 689, appeals, to be allowed to the appellants as against the libelant, Frank A. Seabring; and so the one-half of the one-third of the cost apportioned to No. 691, appeals, to be allowed to the appellants as against the libelants Lynah and Read; and the other third apportioned to No. 690, appeals, to be borne by the appellants. *And it is so ordered.*