---

## THE IRIS.

### (District Court, D. Massachusetts. June 23, 1898.)

### No. 933.

1. MARITIME LIENS—REPAIRS AUTHORIZED BY OSTENSIBLE OWNER.
   Where a vessel is sold, and, after part payment of the purchase price, is delivered to the purchasers, under the circumstances stated below, with authority to repair her at their own expense, the seller thereby invests the purchasers with power to create a lien for repairs made by persons without notice of the vendor's title.

2. SAME—INQUIRY AS TO TITLE.
   Under the circumstances stated below, a repairer may rely on the apparent authority of the legal possessor and ostensible owner of a vessel to bind her for necessary repairs, and need not institute an inquiry into her record title.

3. LIEN GIVEN BY STATUTE—INTENT TO GIVE CREDIT TO VESSEL.
   In determining if credit was given to the vessel or only to her owner, in the absence of express agreement, regard will be had to the circumstances of each case, including the laws and usages of the port in which the repairs were made.

4. REPAIRS AUTHORIZED BY OSTENSIBLE OWNER — PERSONAL LIABILITY OF OWNER.

The owner of a vessel is not personally liable for repairs made in reliance on the ownership of one whom he had clothed with possession and apparent ownership.

Carver & Blodgett, for libelants.

Charles S. Hamlin, for respondent.

LOWELL, District Judge. The steamer Iris was the property of Mr. Woodworth, the claimant, and her home port was Boston. Having been laid up for several years, she was greatly out of repair, both as to her hull and her machinery. On December 23, 1897, Woodworth agreed to sell her to the North American Mining & Transportation Company. A part payment of $1,000 was made at the time the agreement was signed, and the balance of the purchase money, $6,000, was to be paid on or before February 21, 1898. By the agreement, the company was permitted to "make such alterations and repairs, such as painting and joiner work, etc., as may be necessary to put said vessel in proper trim for a voyage to Alaska; to move her to some proper place in Boston where she may undergo the above repairs, etc., at the expense of" the company. The agreement further provided that if the full purchase money was not paid by February 21, 1898, the company should forfeit whatever money had been paid; also, expenses incurred by it on repairs, etc., at that time. On February 21 a further part payment of $2,000 was made, and the time of final payment was extended to March 14. Before that time the company had become hopelessly insolvent, and the claimant thereupon retook the steamer. At various times in January and February the libelants made repairs on the steamer, and furnished her with supplies. They assert a lien under Pub. St. Mass. c. 192, § 14 et seq. The claimant denies that the vessel is liable for the repairs.

About January 4, 1898, one Bartlett, a master mariner, was engaged by the company as master of the Iris, and was directed to cause her to be repaired so that she could make the proposed voyage to Alaska. The company gave him a letter, addressed to the claimant, which read as follows: "Please give Captain Bartlett an order for removing the Iris to Simpson's dry dock on our account." The claimant thereupon gave Capt. Bartlett an order, addressed to the custodian of the Iris, directing him to deliver the steamer Iris to the bearer, to be taken to East Boston. Capt. Bartlett took her to Simpson's dry dock accordingly, procured a survey of her by the United States inspectors, and engaged the libelants to make the repairs, most of which were ordered by the inspectors. All the repairs made were reasonably necessary. Doubtless, they were more extensive than had been contemplated by the parties at the time the agreement was signed, and the nature of some of them lies outside the precise terms of the agreements; but they were necessary to carry out the general intent of the parties, the claimant was sufficiently informed of their nature as they were made, and he offered no objection to their execution. As against the libelants, he cannot now be heard to object that they were made in violation of the contract. By thus delivering the Iris into the charge of the company, and permitting it to employ the libelants in

making repairs on the vessel without giving them notice of his title to the vessel, I think that the claimant held out the company to the libelants as the owner of the vessel, so that, as between the libelants and the claimant, the company is to be taken as her owner. There is here no question of mortgagee's rights, and, as between the claimant and the company, the former is, of course, the true owner; but that the company was the owner of the vessel, at least in so far as to be able to create a lien upon her for repairs, seems to me the conclusion which a reasonable man in the libelants' position would draw from the claimant's conduct. Very extensive repairs were to be made. The execution of these repairs, under the statutes of Massa- chusetts, frequently gives rise to a lien. It was probable that some, at least, of the contractors would seek to hold the vessel for the amount of their bill. They understood, as Capt. Bartlett understood, that they had a lien. The understanding was not the less definite be- cause unexpressed. Capt. Crandall's understanding of the matter exemplifies the view of it which would be taken by a reasonable man. In the absence of notice, and under the circumstances of the case, a delivery of the vessel to the company seems to me a waiver of any objection against the creation of a lien by the company.

It is argued that no representations were made by the claimant to the libelants. But it was the claimant's conduct, rather than his words, which constituted the representations; and this conduct, as the claimant should have foreseen, naturally influenced the libelants' actions. Moreover, as will be shown, the claimant made several verbal representations to Capt. Bartlett, which representations, as might have been expected, determined Bartlett's conduct to the libel- ants, and so affected the libelants' action. It may be said, of course, that the libelants should have inquired of the claimant. But few, if any, of them knew of his existence, and this ignorance of theirs the claimant must have known to be probable. Moreover, it is by no means clear that a visit to Mr. Woodworth would have enlightened anybody. A moment after he had given Capt. Bartlett the written order to the custodian of the vessel, Capt. Bartlett came back into his office, and asked if it was all right to make these repairs on the boat. Mr. Woodworth testified that he replied that he had nothing to do with the repairs; that he had sold the boat to the transportation company, which had paid a forfeit of $1,000, and had 60 days in which to pay the balance; that his whole interest in the boat was to get the balance of the money, and see that she was not injured by the repairs; that he had given the transportation company permission to make the repairs at its own expense, so long as it did not injure the vessel. This is Mr. Woodworth's story. On the other hand, Capt. Bartlett and Mr. Ball, an engineer, testified that, in reply to Capt. Bartlett's question, Mr. Woodworth said that he might go ahead and make repairs, and that anything said by the agent of the transporta- tion company was right. This conflict of testimony does not seem to me very important. Capt. Bartlett sought to learn if he might make repairs on the vessel as directed by the company. Mr. Wood- worth told him that he might do so, but that he (Woodworth) would not pay the bills, inasmuch as they were to be paid by the company

which had bought the vessel. Even if Mr. Woodworth described to Capt. Bartlett the contract of sale as precisely as Mr. Woodworth testified that he did, still I think he came short of indicating that the repairers were to have no lien upon the vessel. He told Capt. Bartlett that he had sold the vessel to the company, and he did not add explicitly that the title to the vessel had not yet passed. Doubtless, a lawyer would have drawn from his words an inference to that effect, but it is not at all clear that a sailor would naturally do so. Mr. Woodworth desired to impress upon Capt. Bartlett that he (Woodworth) was not to be held personally liable for any work done on the vessel. That he made abundantly clear, but I do not think his language fairly suggested any intention to negative the company's right to create the lien which existed under the law of Massachusetts in the case of repairs made upon a vessel. In this interpretation of his language I am confirmed by an interview between the claimant and Capt. Crandall, the United States inspector. Capt. Crandall, who feared that a misunderstanding might exist concerning the lien of the libelants, went to Mr. Woodworth soon after the repairs were begun, and asked him if the steamer was really sold to the company, to which Mr. Woodworth replied in the affirmative. Capt. Crandall continued by explaining the reason of his question, saying that he did not know how it might turn out with Mr. Woodworth if the company did not pay the bills. Capt. Crandall added that he knew that the libelants had the steamer to fall back upon, and would naturally look to her for the payment of the bill. Mr. Woodworth replied that it was understood that the company should fit up the vessel, but said nothing indicating any understanding on his part that his ownership was to defeat the usual lien. This conversation was brought to the notice of Capt. Bartlett, and naturally confirmed him in his belief that he had full power over the vessel. It is valuable, also, as indicating clearly what was Mr. Woodworth's conception of the whole transaction. I doubt if he ever gave the idea of a lien a moment's thought. Even the assertion by Capt. Crandall that a lien existed did not interest him. He was careful to assert to every one that he was not to be held personally liable for the cost of the repairs, but he permitted every one to assume that the lien existed. Not only, then, did the claimant's conduct naturally lead the libelants to think that the company had a right to create a lien upon the Iris for the repairs executed, but the claimant himself, when questioned, gave a silent assent to that interpretation of the contract of sale.

The view I have taken of the effect of the transaction is sustained by several decided cases, such as The John Farron, 14 Blatchf. 24, Fed. Cas. No. 7,341, reversing the decision of the court below; The James H. Prentice, 36 Fed. 777; The Alvira, 63 Fed. 144; The James Smith, 2 Pars. Shipp. & Adm. 146. In The H. C. Grady, 87 Fed. 232, the repairs, for the cost of which a lien was claimed against the vessel, were executed in part after the libelants knew that the person who had ordered the repairs, and into whose custody the vessel had been put, was not her owner. This knowledge was certainly sufficient to put the libelants upon inquiry. As to the remaining repairs, it is not stated plainly in the opinion if, at the time of their execution, the

libelants knew the claimant's relation to the vessel.    From the facts which are stated, I am disposed to infer that the libelants did know it, or ought to have known it; and, if so, The H. C. Grady is entirely distinguishable from the case at bar.    It is true that it is said in the opinion, at page 238, that the possession of the steamer did not give ostensible authority to create a lien for repairs.    In The H. C. Grady, as in The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, this may well have been true.    Mere possession does not always give such authority, but, in the case at bar, possession, taken together with the other evidence in this case, seems to me to confer upon the possessor "ostensible authority."    I need not here discuss the cases of which The Valencia is a type.    In that case the supplies were furnished on the order of a charterer, and it was held that the circumstances put the libelant upon his inquiry as to the existence and terms of the charter party.    See, also, The H. C. Grady, 85 Fed. 239.    I can find nothing in this case to put the libelants on inquiry.    It is true that, if they had gone to the registry, they would have found that Woodworth was the owner of the vessel; but I think they were justified in relying upon Woodworth's holding out the company as the owner of the Iris, without instituting an inquiry into the condition of her record title.    If they were bound to go, then every repairer who contracts with the legal possessor and ostensible owner of a vessel takes his risk that the registry may disclose some defect in the possessor's title.    Indeed, if the libelants had gone to Woodworth himself, as has been already observed, it is improbable that they would have been undeceived.

Assuming then, as between the libelants and the claimant, that the company is to be taken as the owner of the vessel, at least so far as to be able to create a lien upon her for repairs, I must next consider if the libelants obtained that lien.    That they are within the terms of the statute, there can be no doubt; but, as was said in The Lottawanna, 21 Wall. 588, in order that this court may enforce the statutory lien, not only must the requirements of the statute be complied with, but, in addition thereto, in order to bring the lien within the jurisdiction of a court of admiralty, credit must be given the vessel. See, also, The Valencia, 165 U. S. 264, 17 Sup. Ct. 323.    In the case at bar it is clear that the libelants intended to give credit to the vessel, and did this so far as they were able; that is, they consistently charged the repairs to the vessel, and looked to the vessel for reimbursement.    It is also true that if they had applied to the company, which, in my opinion, must be held to be the owner of the vessel so far as they are concerned, that company would undoubtedly have expressly assented to the lien.    This application, however, the libelants did not make.    It is contended by the claimant that, while repairs made on the vessel at her home port may give a lien if it is expressly agreed to by both parties, yet the presumption is that no such lien exists, but that the credit is given solely to the owner,—in this case, the transportation company.

By the civil law, a lien in favor of those who make repairs exists against both foreign and domestic vessels; and this apparently as a matter of strict right, and not in consequence of a presumption that

such a lien has been agreed to in the particular case by the vessel's owner. Lord Stowell has stated that this was once the law of England. See The Zodiac, 1 Hagg. Adm. 321, 325. And such apparently for some years the law was held to be in this district. See The George T. Kemp, 2 Low. 477, Fed. Cas. No. 5,341. In England the common-law courts have encroached so far upon the jurisdiction of courts of admiralty, that the repairer has now no maritime lien, unless he has taken and retained possession of the vessel. See The Henrich Bjorn, 10 Prob. Div. 44, 11 App. Cas. 270; The Marion, 1 Story, 68, Fed. Cas. No. 9,087. In the United States the maritime lien of the repairer exists in full force, if the repairs are made on the credit of a foreign vessel; and, in the absence of the owner, it is said that repairs made upon a foreign vessel are presumed to have been made upon its credit. But if the owner be present, though in a foreign port, it has been said that there is a presumption that the repairs were made, not on the credit of the vessel, but on the credit of the owner personally. Thomas v. Osborn, 19 How. 22. The presence of the owner does not, however, defeat the lien as a matter of law, but at most does no more than establish a presumption of fact that the lien does not attach. See The Kalorama, 10 Wall. 204. This presumption that a lien does not exist for repairs made upon a foreign vessel, if the owner be present, is, in different decided cases, rested upon one or more of three grounds:

First. It has been said that, if the owner be in the port, the master of the vessel has no implied authority to bind either him or his vessel. This proposition seems in general to be sound; for, in so important a matter, the repairer, if he wishes to bind the master's principal, should apply to the principal himself. Where the owner is absent, the master of the vessel has very extraordinary authority; but, where the owner is present, it is but reasonable to hold that the master's authority is much curtailed. "Undoubtedly the presence of the owner defeats the implied authority of the master." The Kalorama, 10 Wall. 204, 214. If, however, the owner himself authorizes the repairs, no question of the master's authority is involved; and, if the owner expressly or impliedly assents that the repairs shall be made on the credit of the vessel, the vessel is bound. Thus, it is said in The Kalorama:

"When the owner is present, the implied authority of the master for that purpose ceases; but, if the owner gives directions to that effect, the master may well order necessary repairs and supplies, and, if the ship is at the time in a foreign port, * * * those who make the advances will have a maritime lien, if they were made on the credit of the vessel." 10 Wall. 213.

Second. It has been said that, when the owner is present in a foreign port, the repairer has ordinarily no lien upon the vessel, because in such case the repairer is presumed not to care for a lien upon the vessel, but to be satisfied with the personal liability of the owner. This state of mind on the part of the repairer is a question of fact. In The George T. Kemp, Judge Lowell says that he never heard of a repairer who was satisfied with the owner's personal liability, but perhaps that is stating the rule too strongly. If the contract for repairs be duly authorized and binding upon the owner, however, a

lien upon the vessel will exist, if the circumstances of the case show that there was an understanding that the repairs should be made on the vessel's credit. The question to whom or to what credit is given should be answered after consideration of all the facts, including the usages and laws of the country where the port is situated.

Third. It is said in not a few cases that the lien of the repairer is conditioned upon a necessity for pledging the credit of the vessel in order to prosecute the voyage, and that this necessity is presumed not to exist when the owner is present in the port. However it may be historically, the statement is now incorrect or meaningless. In the absence of the owner, the necessity is conclusively presumed; and though the owner be present, and abundantly supplied with money, his agreement to a lien will bind the vessel.

These three different principles, according to which it is held to be presumed that there is no lien when the owner of a foreign vessel is present in port, have been stated indiscriminately as if they were identical, yet plainly the nature of the presumption will differ greatly according as it depends upon one or another of them. It seems, on the whole, that in the United States a repairer has a lien on a foreign vessel, if the repairs were made on the vessel's credit; that, if the owner was absent from the port where the repairs were ordered by the master, there is a presumption of fact that the master had authority to order them, and that credit was given to the vessel. Where the owner is present, he must order the repairs himself, or authority from him to order the repairs must be shown. Where he has ordered them himself, or due authority from him is shown, the execution of the repairs will or will not be deemed to give rise to a lien, according to the facts of the case, including the laws and usages of the port.

These principles of maritime law applicable to liens upon foreign vessels have now to be applied to liens upon domestic vessels given by statute. These last liens are enforceable in the courts of the United States, and in those courts only. The Lottawanna, 21 Wall. 558; The Glide, 167 U. S. 606, 17 Sup. Ct. 930. In order that a lien may attach, not only must the terms of the statute be strictly complied with, but the libelant must show that credit was given to the vessel. The Lottawanna, 21 Wall., at page 581. The repairing a domestic vessel has been likened to the repairing a foreign vessel whose owner is present in the port; and it has been said that in the case of a domestic vessel there is a presumption that the repairs were not made on the credit of the vessel, and that there is therefore a presumption that the lien does not exist. As in the case of a foreign vessel, so in the case of a domestic vessel. If the presumption be taken to mean that the authority of the master of a domestic vessel to contract for her repair cannot always be presumed, the statement is reasonable. The owner of a domestic vessel in some cases must be sought out, and the authority of the master to bind him will not be presumed as readily as in the case of a foreign vessel whose owner is absent; but where the master had authority to order the repairs, or where they were ordered directly by the owner, it seems that credit is to be deemed to have been given to the vessel, or to the owner personally, or to both, according to the laws and usages of the domestic port, and the circumstances of the

particular case. That a lien upon a foreign vessel is not conditioned upon a necessity to pledge the vessel's credit has been shown, and it may safely be said that a necessity for pledging the vessel's credit has nothing to do with a lien upon a domestic vessel, except, perhaps, as evidence that credit was given to the vessel rather than to the owner. It is tolerably plain that the purpose of the statute was not so much to aid a domestic vessel in distress as to protect the repairer.

In The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, it is said, indeed, that:

"In the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived."

In The Valencia, however, the real dispute was concerning the authority of the person ordering the supplies, and the remark above quoted was made obiter. That an agreement for a lien, expressed or implied, is necessary, there can, of course, be no doubt. The question to be answered is this: From what facts is a lien to be implied? In The Valencia, the law, usages, and circumstances may well have been different from those in the case at bar. In the case of The St. Jago de Cuba, 9 Wheat. 409, 416, 417, also, from the opinion in which a part of the above-cited extract from The Valencia is quoted, the expressions relied on by the claimant were made obiter. It must be added that a lien in favor of any material man or laborer is, by reason of the numerous statutes which have given such liens, much less in derogation of common custom than it was 75 years ago, when The St. Jago de Cuba was decided. This change of law may well modify a presumption of fact which was properly drawn under other conditions.

Applying the principles above stated to the facts of this case and having assumed, for the reasons first given, that the transportation company is to be treated as the owner of the Iris, we find that the repairs were made upon her, and the supplies furnished, by the order of Capt. Bartlett. It has not been suggested in argument that Capt. Bartlett did not have full power to bind the company for the materials, repairs, and supplies, and it is admitted that the company is itself liable for them to the libelants. Inasmuch as the laws of Massachusetts give a lien generally in these cases, which fact must be presumed to have been known to all parties concerned, and inasmuch as the custom of repairers is to look to the vessel for credit, I think it is not going too far to hold that in this case credit was given by the libelants to the Iris without the objection, and with the assent, of the company. There must therefore be a decree for the libelants. The conclusion is the more satisfactory because any other would do great injustice. That the claimant, who owned on January 1 a thoroughly unseaworthy vessel, should on April 1, without the expenditure of a cent, own a thoroughly seaworthy vessel, and $3,000 to boot, while those whose labor repaired the vessel go without pay, is a conclusion which should be escaped, if escape is in any way legal.

The claimant has filed a petition to have his stipulation canceled upon the ground that it is for a larger amount than the true value of

the steamer. As the claimant entered into the stipulation deliberately, and without objection to its amount, his error in valuation is not a sufficient reason for cancellation.

The claimant also has asked that his liability be limited to the value of the steamer, or, rather, to the amount of his stipulation. Clearly, the libelants have no right to a decree against the claimant in personam. It has been held that they have a lien upon the vessel, because the claimant held out to them the transportation company as its owner; but it would be highly unjust to permit the libelants to deny the claimant's ownership for the purpose of maintaining their lien, and in the same action to assert his ownership for the purpose of holding him personally liable. Capt. Bartlett had in fact no authority to bind the claimant personally, and no one' of the libelants ever supposed that he had. He had authority only to bind the company, and to create a lien upon the vessel. The fact that the vessel is liable does not conclusively establish the liability of her owner. See Henry, Adm. Jur. & Prac. § 42; The Freeman v. Buckingham, 18 How. 182; The Alvira, 63 Fed. 144, 145.