**LAKE UNION DRYDOCK COMPANY
and Duwamish Shipyard, Inc.,
Plaintiff-Intervenors,**

v.

**M/V POLAR VIKING, her engines, boilers, machinery, tackle, apparel, furniture, and appurtenances, Defendant,**

**Red Circle Transport, Claimant.**

**No. C76–810B.**

United States District Court,
W. D. Washington.

Feb. 6, 1978.

Douglas Fryer of Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for plaintiff-intervenors.

James H. Bauer of Detels, Draper & Marinkovich, Seattle, Wash., for claimant.

## OPINION

BEEKS, Senior District Judge.

In this case plaintiffs Lake Union Dry-dock Company (Lake Union) and Duwamish Shipyard, Inc. (Duwamish) seek to foreclose maritime liens against the M/V POLAR VIKING pursuant to the Maritime Lien Act.[1] Plaintiffs supplied materials and/or rendered services to the vessel while she was under a sub-demise charter to Northland Marine Lines (NML) from her owner *pro hac vice* Red Circle Transport (Red Circle), claimant herein. NML filed a Chapter XI petition while the POLAR VIKING was in its possession. This Court has previously determined that it has jurisdiction of the controversy.

Lake Union and Duwamish have filed a motion for summary judgment and, alternatively, a motion for partial summary judgment which involves striking certain contentions of defendant set forth in the Pre-Trial Order. Red Circle claims that the motions for summary judgment are premature and it has filed an alternative countermotion for summary judgment. Before proceeding to the merits, therefore, it must be determined whether such procedure is proper at this juncture.

On December 10, 1975 Red Circle sub-chartered the POLAR VIKING to NML for a period of one year. Between January 17 and February 18, 1976 Duwamish fabricated a stern roller with hydraulic actuated pins for the POLAR VIKING at the request of NML for $14,153.53. Duwamish did not install the stern roller on the vessel nor was the vessel in Duwamish's yard. Red Circle alleges, and Duwamish does not dispute, that Duwamish knew that NML utilized chartered vessels prior to commencing such work.

Red Circle also contends that Duwamish knew or should have known that NML was facing possible insolvency prior to performing the work, but nothing in the record supports this vague contention. During the four months before Duwamish undertook performance, NML had an outstanding balance of $100,000 and at the time work was begun the balance was over $90,000. For the period from June 30, 1975 to October 11, 1976 the outstanding balance vacillated between $49,399.19 and $143,176.01, and Duwamish received approximately $107,000 in payments.[2] Duwamish did not learn of any financial difficulty of NML until May, 1976.[3]

In June and again in August, 1976 Lake Union performed certain repairs on the POLAR VIKING at the request of NML. The first services were invoiced on July 20 in the amount of $10,614.73. The August repairs were invoiced on September 24, 1976 at $3,481.23. According to the deposition of Mr. Stebbins, manager of Lake Union's dry-dock facility, NML generally hired Lake Union to perform emergency repairs only, as were those performed on the POLAR VIKING.[4] Over a ten year period NML was generally slow in paying and a payment schedule usually had to be arranged. NML "religiously" followed the payment schedules until about April, 1976.[5] At that time Lake Union began to file notices of claim of lien against NML vessels "pretty regularly,"[6] apparently to encourage NML to enter into payment schedules.[7] As Stebbins put it, they "were just about holding their own."[8]

It was also during April that Lake Union discovered that NML chartered some of its vessels. This was contrary to its previous belief of ten years that NML owned its vessels. This belief was based on the fact that the names of NML vessels always be-

---

1. 46 U.S.C. §§ 971–975.

2. Bauer aff., Ex. 11.

3. Larsen aff., at 2.

4. Stebbins dep., at 9.

5. *Id.* at 9–10.

6. *Id.* at 11.

7. *Id.* at 17.

8. *Id.* at 24.

gan with POLAR and that the vessels were painted the same colors.[9]

While the POLAR VIKING was in drydock, Lake Union learned that the vessel was under charter.[10] Lake Union then attempted to discover the ownership of the vessel through listings in Dun & Bradstreet, which led to an interior design firm. (The vessel was apparently listed under its former name, OCEAN GULF). Its requests to see NML's charter and a financial statement were refused, but it was assured that NML was negotiating to purchase the vessel at that time and that the account would be paid in a matter of days. Mr. Stebbins called a marine contractor located next door to NML and learned that he had just undertaken a $70,000 job for NML.[11] Stebbins then decided to proceed with the work.

On October 27, 1976 NML filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. On November 19 a complaint *in rem* against the vessel was filed by Peter Pan Seafoods, Inc., (whose claim has since been settled) and the vessel was arrested by the Marshal. Duwamish and Lake Union filed a motion to intervene on November 22. On November 29 Red Circle entered independent stipulations to abide judgment as to the claims of Lake Union and Duwamish and as to the claim of Peter Pan Seafoods. The next day POLAR VIKING was released from the custody of the Marshal. Lake Union and Duwamish were granted leave to intervene on December 13, 1976, two days before the bankruptcy trustee was to have returned possession of POLAR VIKING to Red Circle.

The above facts are not in dispute. Accordingly, this action is a proper one for decision by summary judgment as only questions of law are involved.

Four questions of law are presented. The primary question, which arises from the undisputed fact that the charter agreement between Red Circle and NML contained a no-lien clause, is whether § 973 of the Maritime Lien Act, as amended in 1971, precludes the assertion of such clause against the plaintiffs, thus barring their maritime lien claims. This is a question of first impression. Should it be resolved in favor of plaintiffs, claimant also asserts three affirmative defenses: 1) waiver; 2) laches; and 3) satisfaction of the underlying debt. If claimant succeeds on any one of such defenses, summary judgment must be granted in its favor. Alternatively, plaintiffs must succeed on all four of the legal issues before summary judgment can be granted in their favor.

## EFFECT OF THE 1971 AMENDMENT

Prior to 1971 the law of materialmen's maritime liens withdrew with one hand what it gave with the other. It authorized the assertion of a maritime lien against a chartered vessel when the services were requested by one with apparent authority.[12] However, § 973 went on to state that "nothing in this section shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefore."[13]

As developed by case law, "the duty to inquire provision was, in effect, allowed to swallow up the presumption of authority provisions."[14] In practice, a no-lien charter clause almost always prevented a maritime lien from attaching, the duty to inquire becoming "all but absolute."[15]

In 1971 Congress deleted that portion of § 973 which barred the attachment of a

9. *Id.* at 11–12.

10. *Id.* at 18–20.

11. *Id.* at 18–19.

12. 46 U.S.C. § 973.

13. Act of June 5, 1920 ch. 250, § 30(R), 41 Stat. 1005.

14. Gilmore & Black, The Law of Admiralty 674 (2nd ed. 1975).

15. *Id.* at 669.

maritime lien where the materialman "knew or . . . could have ascertained" that the individual requesting the services was without authority to do so. While this appears to mean that a materialman's lien vests absolutely as a matter of law, as plaintiffs suggest, the Congressional history clouds the picture. The committee report which accompanied the House bill (the version ultimately adopted) recites that the duty of inquiry has been eliminated. "The practical effect of the bill is to negate the operation of a 'no lien provision' in a charter to which the American materialism (sic) [materialman] was not a party and of which he has no knowledge so that he will not be precluded from acquiring a lien for his services to which he would otherwise be entitled." [16] On the one hand, the statute on its face makes no suggestion that any quantum of knowledge will bar the assertion of a lien. Yet, the legislative history indicates that the assertion of a maritime lien will be barred if the materialman has knowledge of a no-lien charter clause.

On the other hand, claimant contends that the amendment changed nothing. It points to the sentence immediately preceding the one just recited which further clouds the picture. That sentence states that the amendment "makes no change in maritime lien law, the priority of maritime liens, or in the accepted definition of necessaries." [17] I believe that both parties have missed the mark.

Claimant adopts the contention of Professors Gilmore and Black that the amended statute merely reinstates the prestatutory general maritime law enunciated in *THE KATE* [18] and *THE VALENCIA*. [19] This argument discerns the materialman's general maritime duty of inquiry pursuant to *THE KATE* and *THE VALENCIA* to be perceptibly different from his pre-71 statutory duty as developed under *U. S. v. Carver*. [20]

I find no such difference, however, and if there be one it is too ethereal for application. The materialmen in the *THE VALENCIA* and those who supplied the vessel CLIO in *U. S. v. Carver* possessed the same quantum of knowledge; neither had knowledge that the vessels were chartered. However, the Supreme Court imputed to them constructive knowledge of the charter and its terms. The Court found that the materialmen had a duty to inquire with "reasonable diligence," [21] and that such inquiry would have revealed a lack of authority by the party requesting the services to bind the vessel. Thus, the materialman's duty to inquire under general maritime law was identical to his duty under the statute prior to amendment in 1971. The former duty provision of § 973 merely incorporated and codified the general maritime law. [22]

▮▮▮▮ Claimant essentially argues that the amended statute, which deleted a duty of reasonably diligent inquiry, requires a duty of reasonably diligent inquiry. It is clear, then, that Red Circle's argument cannot be accepted for it would render useless the Congressional intendment in amending the statute. Statutory amendments are usually intended to alter the law and I believe this to be such an amendment. [23] The statement found in the legislative history that the amendment makes no change in the law of maritime liens is merely an attempt by Congress to serve notice that the effect of the amendment is limited. It is not intended to affect the law of mari-

---

**16.** 2 U.S. Code Cong. & Admin. News p. 1365 (1971).

**17.** *Id.*

**18.** 164 U.S. 458, 17 S.Ct. 135, 41 L.Ed. 512 (1896).

**19.** 165 U.S. 264, 17 S.Ct. 323, 41 L.Ed. 710 (1897).

**20.** 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923). *See* Gilmore & Black, *supra* at 687.

**21.** *THE VALENCIA, supra,* 165 U.S. at 270, 17 S.Ct. 323, 41 L.Ed. 710; *U. S. v. Carver, supra,* 260 U.S. at 488–89, 43 S.Ct. 181, 67 L.Ed. 361.

**22.** *Kane v. M/V LEDA,* 355 F.Supp. 796, 799 (E.D.La.1972), *aff'd,* 5 Cir., 491 F.2d 899, *cert. denied,* 419 U.S. 865, 95 S.Ct. 120, 42 L.Ed.2d 102 (1974).

**23.** *Argosy Limited v. Hennigan,* 404 F.2d 14, 20 (5th Cir.1968).

time liens generally, but merely to enlarge the right of a materialman to assert a lien against a vessel when he has no knowledge that the person requesting necessaries is without authority to do so.

The meaning of § 973 cannot be determined solely on its face because Congress has unfortunately failed to clearly express itself. Rather, three factors must be evaluated to discern the meaning of the statute: language, history, and the relationship of the provision to the entire statutory scheme.[24] The statute on its face demonstrates that the duty of inquiry has been eliminated. The legislative history indicates that a lien will be barred if the materialman has knowledge of the no-lien clause. In harmonizing these two factors, the statute must be construed to entitle a materialman to a maritime lien for necessaries furnished to a vessel unless he has *actual* knowledge that the vessel is operating under a charter which contains a no-lien provision. In other words, the assertion of a lien will be barred only if the materialman has actual knowledge of the no-lien clause. Since actual knowledge will bar the assertion of a lien, plaintiffs' contention that a materialman's lien vests absolutely is erroneous.

This interpretation is in harmony with the presumption of authority provisions of §§ 972 and 973. The owner of a vessel must now establish that the materialman had actual knowledge of a no-lien clause if he is to overcome the materialman's statutory presumption. The imposition of this burden is supported by the legislative history. Congress intended to place the greater burden upon the vessel owner: "As a practical matter, the owner can more easily protect himself contractually by bonds or otherwise at the time he charters the vessel, than can the American materialman who furnishes necessaries to a vessel under great economic pressure to put back to sea."[25]

I believe that § 973, as here construed, will achieve the purpose desired by Congress. It recognized that an innocent materialman required greater protection than the pre-amendment statute provided. It also recognized that a materialman with actual knowledge needed no further protection; he could protect himself by refusing to service a vessel, by arranging for payment, or he could merely assume a known risk.

Claimant also contends that the intent of Congress was to deal solely with itinerant foreign flag vessels. While Congress certainly had this problem in mind when the statute was enacted, it did not so limit its application. Another motivation for favoring the materialman was to relieve him of the time pressures inherent in the requirement of reasonably diligent inquiry. "Granting the materialman a lien encourages the prompt furnishing of necessaries to vessels so that they can be speedily turned around and put to sea. This is especially significant today when the emphasis on vessel performance is reduced port time and increased speed."[26] Surely itinerant foreign flag vessels have no monopoly on concern for vessel performance.

In light of the above, it is clear that the no-lien clause of the charter under which NML operated the POLAR VIKING is not binding upon plaintiffs. Neither had actual knowledge thereof. Accordingly, the assertion of their liens is not barred.

## WAIVER

Claimant's contention that plaintiffs have waived their liens under *THE PRESIDENT ARTHUR*[27] is without merit. Although plaintiffs entered into negotia-

---

24. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973).

25. 2 U.S. Code Cong. & Admin. News p. 1365 (1971). *See Nacirema Operating Co., Inc. v. S.S. AL KULSUM*, 407 F.Supp. 1222, 1225 (S.D.N.Y.1975).

26. 2 U.S. Code Cong. & Admin. News p. 1365 (1971).

27. 279 U.S. 564, 571, 49 S.Ct. 420, 73 L.Ed. 846 (1929).

tions with NML for the payment of outstanding indebtedness, there is no indication that they intended to rely solely on the personal credit of NML. The materialman does not waive his lien merely by relying on the personal credit of the owner or charterer.[28] He may rely on both.[29]

## LACHES

Claimant further contends that had plaintiffs promptly asserted their claims against the vessel, Red Circle would have immediately retaken possession, thus preventing it from being subjected to further claims while under control of NML. Presumably, this could have occurred as early as mid-March, thirty days after Duwamish completed fabrication of the stern roller. Thus, the subsequent materialmen's liens and those of six seamen for wages, allegedly arising as a result of the delay, would theoretically have been prevented.

Red Circle's argument is based upon the affidavit of its general counsel who negotiated the charter and was responsible for overseeing it. He avers that "[i]t was a policy of Red Circle that if we were notified of any lien or charge against a chartered vessel as a result of the charterer's activity or conduct, we required immediate payment of that lien or charge or took immediate steps to repossess that vessel. That policy would have been applied with reference to the POLAR VIKING had we been notified of the lien charges of Duwamish Shipyard, Lake Union Drydock, and Peter Pan Seafoods at the time they became due and owing by Northland Marine Lines." [30]

■ It is not clear by what means Red Circle was to be notified of outstanding charges against the vessel. The plaintiffs had no duty under the charter to notify Red Circle of outstanding charges. The 1971 amendment makes this clear. Nor does the doctrine of laches require a materialman to institute litigation to foreclose his lien immediately after the charge goes past due. "Laches is much more than time. It is time plus prejudicial harm . . ." [31]

Claimant relies on cases wherein the doctrine of laches was imposed after a delay of six months.[32] However, the services rendered to the POLAR VIKING by the plaintiffs were so rendered within approximately six months of each other. Taking the invoice dates as reference points, Duwamish invoiced its charges on March 31, 1976. The last charge against the POLAR VIKING made by either of the plaintiffs was invoiced on September 24, 1976 by Lake Union Drydock. It appears that these liens arose within six months of each other, and that none would have been precluded even if Duwamish had instituted suit six months after the invoicing date.

■ Laches, however, is not dependent upon the application of strict time limits.[33] Laches depends upon the presence of both inexcusable delay and prejudicial delay.[34]

■ I find no inexcusable delay. Each plaintiff undertook commercially reasonable methods for the payment of the outstanding charges. NML had an open account with plaintiffs and continued making payments on its outstanding balance. For example, Duwamish received approximately $43,000 from NML between the time the stern roller was invoiced and the time NML

**28.** *Interstate Tractor & Equipment Co. v. THE MYLARK,* 90 F.Supp. 466 (D.Or.1950). *See Nacirema Operating Co., Inc. v. S.S. AL KULSUM,* 407 F.Supp. 1222 (S.D.N.Y.1975).

**29.** *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 10, 41 S.Ct. 1, 65 L.Ed. 97 (1920).

**30.** Schmidt aff., at 2.

**31.** *Fidelity & Casualty Co. v. C/B MR. KIM,* 345 F.2d 45, 52 (5th Cir.1965).

**32.** *See, e. g., THE MORNING STAR,* 1 F.2d 410 (W.D.Wash.1924); *THOMAS SHERLOCK,* 22 F. 253 (S.D.Ohio 1884).

**33.** *See Czaplicki v. S.S. HOEGH SILVER CLOUD,* 351 U.S. 525, 533, 76 S.Ct. 946, 100 L.Ed. 1387 (1956).

**34.** *Akers v. States Marine Lines, Inc. et al.,* 344 F.2d 217 (5th Cir.1965).

filed for an arrangement.[35] Lake Union made no attempt to enforce its first lien claim for a charge invoiced on July 20, 1976 apparently because NML was "just about holding its own" in meeting the various payment schedules negotiated as a matter of course between the two parties. Only three months passed from the time of the invoice until the time when NML filed for an arrangement on October 27, 1976. In other words, none of the plaintiffs slept on their rights. There was no inexcusable delay in filing suit in light of modern commercial realities which are, of course, part of the peculiar equitable circumstances which must be taken into account when considering a claim of laches.[36]

Furthermore, claimant's reliance on *U. S. v. S.S. LUCIE SCHULTE*[37] is inapposite. That case turned on the applicability of a no-lien charter clause (pursuant to the Federal Maritime Lien Act) against a cargo claimant seeking to assert a lien. Of course, the lien act has since been amended. Claimant also cites cases involving bona fide purchasers of vessels. Such cases are also inapposite.

▮ Nor do I find any prejudicial delay. Claimant's contention that the immediate assertion of the liens against the vessel would have terminated NML's right to possession under the charter and thus would have prevented subsequent liens from arising is nothing more than an attempt to breathe new life into the no-lien clause via the doctrine of laches. In a very real sense claimant was the engineer of its own misfortune. Any prejudice suffered was the result of its own lack of diligence and inquiry. It knew or should have known that lienable charges would arise against the POLAR VIKING during its year of operation by NML. It could have requested a performance bond or incorporated periodic reporting requirements in its charter. Instead, it relied on a charter clause whose applicability against materialmen became

at least doubtful after the amendment of the act. I am satisfied Congress intended the primary responsibility to be on the owner to protect its vessel from the assertion of liens while under charter, including seamen's liens for wages and materialmen's liens such as here involved. No prejudicial delay has been shown.

Accordingly, the lien claims are not barred by laches.

## SATISFACTION OF THE UNDERLYING DEBT

Claimant finally contends that plaintiffs have been paid for the lien claims here asserted. Its novel argument runs as follows: Red Circle notes that NML made payments within four months of the bankruptcy action on its open accounts with Lake Union and Duwamish subsequent to the POLAR VIKING transactions; that under section 60 of the Bankruptcy Act, 11 U.S.C. § 96, these payments may be viewed by the trustee in bankruptcy as voidable preferences if they were made on account of an antecedent or pre-existing debt, citing *Aulick v. Largent,* 295 F.2d 41, 45 (4th Cir. 1961); but that if the payments made correspond to a contemporaneous transfer of goods or services, the transfers cannot be said to be preferential and are not subject to recall by the trustee, citing 3 Collier on Bankruptcy ¶ 60.23, at 876.1 (14th ed. 1976); *In re Haupt & Co.,* 424 F.2d 722 (2d Cir. 1970); and that since the POLAR VIKING transactions were the last undertaken for NML by plaintiffs, they are the only possible contemporaneous transactions. Therefore, claimant argues, if plaintiffs "are to retain those funds against a challenge they are voidable [preferential] transfers, the monies must be applied to the POLAR VIKING bills. If so applied, then the accounts have been fully paid," apparently because the payments were in excess of the POLAR VIKING bills.

---

**35.** Bauer aff., Ex. 11.

**36.** *Czaplicki v. S.S. HOEGH SILVER CLOUD, supra,* 351 U.S. at 533, 76 S.Ct. 946, 100 L.Ed. 1387.

**37.** 343 F.2d 897 (2d Cir.1965).

 While it is the law that a lien must fail where the underlying debt has been satisfied, claimant has not established that this has in fact occurred. Voidable preferential transfers are within the province of the trustee in bankruptcy.[38] There is no indication that the trustee has voided the transfers or that such a matter is now before him or even contemplated. Thus, this argument is simply theoretical and claimant, in any event, has no standing to assert it.

 The evidence, on the contrary, shows that the underlying debts against the POLAR VIKING have *not* been satisfied. Lake Union had the right to allocate payments by NML and none of the payments made were allocated to the POLAR VIKING bill.[39] It also appears that Duwamish Shipyards routinely applied Northland payments to the oldest job first.[40] NML's open account balance never fell below the amount owed for the POLAR VIKING work between the time the stern roller work was completed until Duwamish entered the case. Thus, in either event, the POLAR VIKING bill was never paid and the liens have not yet been satisfied.

Red Circle finally argues that Duwamish applied payments received to the general balance, without specifying particular vessels or job order accounts, and that a lien ought not to arise in such circumstances "particularly as there were other items in the account for which liens may not be asserted. *THE SOPHIA JOHNSON*, 237 F. 406 (W.D.Wash.1916)."

 Applying payments to the oldest charges first is a common method of handling an open account. Lake Union also conducted its open account with NML in this manner.[41] Furthermore, Duwamish clearly invoiced the work to "D/T POLAR VIKING and/or owners."[42] A creditor has the "right to apply a general payment made to any account which it may have against the debtor when no application is made by the debtor himself, but this must be done at the time and before any controversy arises."[43] There is no allegation that plaintiffs altered the allocation of payments received.

Furthermore, the proposition for which *THE SOPHIA JOHNSON* is cited by claimant is erroneous. The court stated, "A party cannot intermingle items for which he has a lien with items for which he has no lien, and then assert a lien for the entire amount."[44] This is not the situation here. Plaintiffs are not here asserting a lien for an amount which includes charges for non-lienable items. This final contention is also without merit.

## CONCLUSION

Accordingly, the motion of plaintiffs for summary judgment is granted. They had no actual knowledge of the no-lien charter clause and thus are not precluded from asserting their liens against the POLAR VIKING, now in the possession of Red Circle Transport, pursuant to the Maritime Lien Act as amended in 1971. The defenses of waiver, laches, and satisfaction are not available to claimant Red Circle under the circumstances here presented. It follows that claimant's countermotion must be denied.

This opinion may stand as the order of this Court.

---

**38.** *See* 3 Collier on Bankruptcy ¶ 60.57[2]; 3 pt. 2 Collier on Bankruptcy ¶ 60.57[1] (14th ed. 1977).

**39.** Bauer aff., Exs. 8, 9.

**40.** Larsen aff., at 2.

**41.** Stebbins dep., at 25.

**42.** Larsen aff., Ex. 1.

**43.** *THE SOPHIA JOHNSON*, 237 F. 406, 407 (W.D.Wash.1916).

**44.** *Id.* at 408.