RAMSAY SCARLETT & CO.,
INC., Plaintiff,

v.

S. S. KOH EUN, her engines, tackle, apparel, etc., in rem, Defendant.

EMPIRE STEVEDORING CO., LTD.,
Intervening Plaintiff,

v.

MCT SHIPPING CORPORATION for S. S. KOH EUN, her engines, tackle, apparel, etc., in rem, Claimant and Third-Party Plaintiff,

v.

WILFRED SCHADE & COMPANY,
INC., Third-Party Defendant.

Civ. A. No. 77–699–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 12, 1978.

---

Walkley E. Johnson, Jr., Crenshaw, Ware & Johnson, Norfolk, Va., for plaintiff.

Peter W. Rowe, Stackhouse, Rowe & Smith, John M. Ryan, Vandeventer, Black, Meredith & Martin, Norfolk, Va., John B. Bennett, Jones, Blechman, Woltz & Kelly, Newport News, Va., for defendant.

## OPINION AND ORDER

CLARKE, District Judge.

This matter came to trial and is now before the Court on the parties' post-trial briefs. While relevant factual details are embodied throughout the Court's opinion, the basic facts brought out at trial or through stipulation among the parties follow.

At all times relevant to this matter, the plaintiff, Ramsay Scarlett & Co., Inc. (Ramsay) was engaged in the stevedoring, ship's agency and terminal business in the City of Baltimore, Maryland, and was engaged in the stevedoring and ship's agency business in the City of Norfolk, Virginia. Ramsay conducted its stevedoring business under the name of Baltimore Stevedoring Company, a division of Ramsay Scarlett & Co., Inc.

At all pertinent times, the Korean motor vessel KOH EUN was a large ocean-going vessel engaged in trade between various ports of the United States, Europe, Africa, and the Middle East. The KOH EUN was under time charter from its owner, Sam Ick, Lines Co., Ltd., to MCT Shipping Corporation (MCT), and under a time charter from MCT to Iran Ocean Shipping Company (IROSCO). IROSCO's general agent in the United States and in Canada was Peralta Shipping Corporation of New York, New York (Peralta), whose subagent was Atlantic Ship Agencies, Inc.

Similar to the IROSCO-Peralta-Atlantic Ship arrangement, there was a series of agency relationships involving Jeddah Overseas Industrial Sea Transport, Ltd. (JOIST), whose general agent was Netumar International, Incorporated, for which Ramsay acted as subagent.

It appears that both IROSCO and JOIST were established, at least in part, by International Maritime Planning and Commercial Technology, Inc. (IMPACT), which was in the business of shipping and operating agents and who became coordinating agent for JOIST and IROSCO.

At all relevant times, Empire Stevedoring Co., Ltd. (Empire) was a Canadian corporation engaged in the business of provid-

ing stevedoring service to vessels in Montreal. Additional parties or organizations related to this matter include: Shipping Aid International, an independent company in Connecticut that would perform various services for carriers such as solicit stevedoring bids and verify stevedoring invoices; Wilfred Schade & Company, Inc. (Schade), a freight forwarder representing, as relates to this action, a shipper, Griffin Pipe Products Company; and U.S.A. Steamship Agency, Inc., agents for MCT.

On October 31, 1977, and November 1, 1977, the vessel KOH EUN called at Montreal, Canada, and was provided stevedoring services by Empire. The reasonable value of such services and materials furnished the vessel at Montreal was $21,415.64. No portion of that sum has been paid and is presently due and owing to Empire.

In November, 1977 the KOH EUN called at Baltimore, Maryland, and at that time Ramsay furnished the vessel stevedoring and terminal services having a value of $29,519.37. Also, in November, 1977 the KOH EUN called at Norfolk, Virginia, and at that time Ramsay provided stevedoring services having a value of $43,788.33 and advanced certain monies and credit and provided certain agency services in the amount and value of $30,653.16. Ramsay attached the vessel in Norfolk in connection with services provided the KOH EUN at Baltimore and Norfolk. In connection with that attachment, Ramsay paid the United States Marshal $5,003.88, of which Empire has contributed $1,000.00. Ramsay has received $7,000.00 on its account from U.S.A. Steamship Company on behalf of MCT and it is stipulated that U.S.A. owes Ramsay an additional $1,058.98, thereby reducing the account for agency disbursements at Norfolk to $22,594.18.

Prior to the arrival of the KOH EUN at Norfolk, Atlantic Ship Agencies, Inc. was appointed subagent for IROSCO lines at Norfolk by Peralta. At the request of Schade, representing the shipper for the cargo to be loaded on this occasion, Atlantic Ship did not serve as subagent for the KOH EUN at Norfolk on this particular occasion whereupon Ramsay was appointed subagent.

A cargo of pipe and accessories shipped by Griffin Pipe as to which Schade was acting in the capacity of a freight forwarder was loaded aboard the KOH EUN during the period November 14–19, 1977. Schade prepared a bill of lading on the form of JOIST covering the Griffin Pipe shipment and indicating prepaid freight due in the amount of $104,892.25. Ramsay signed the bill of lading on November 14, 1977.

Thereafter Schade paid Ramsay $89,-640.01 representing the freight due for the cargo of pipe less $15,252.24 allowed Schade as payment of brokerage due on the KOH EUN and two previous vessels. The money received by Ramsay was credited to the JOIST account with Ramsay.

Empire entered Ramsay's *in rem* action against the KOH EUN as Intervening Plaintiff asserting a lien in the amount of $21,415.64 for the stevedoring services provided the KOH EUN at Montreal.

MCT, as time charterer and disponent owner of the KOH EUN, entered the present suit to defend the vessel, counterclaimed against Ramsay and entered a third party complaint against Schade.

So far as possible, the Court will discuss the several issues as the events occurred chronologically.

### Empire's Claim of Lien

Prior to the arrival of the KOH EUN in Montreal, Captain Jacobsen of Shipping Aid requested stevedoring rates from Ted Chodos, president of Empire. Thereafter, Chodos contacted Erik Murer, president of IMPACT, who told Chodos that Empire could stevedore the KOH EUN in Montreal and that Empire should invoice IROSCO for such services. Apparently, the matter of the actual ownership of the vessel was not mentioned in the dealings between Empire, Shipping Aid and IMPACT; and Chodos of Empire mistakenly believed that IROSCO was the owner of the vessel while in fact IROSCO was a time charterer. It is undisputed that Chodos was not advised nor did

he inquire whether IROSCO was the record owner or time-charterer of the KOH EUN.

Empire claims that it provided stevedoring services to the KOH EUN in reliance on the vessel as security and thus has a lien on the vessel for the value of those services. Empire claims that it was justified in its belief that it was dealing with parties possessing apparent authority to bind the vessel and that there was no information to put Chodos on notice that Empire actually was dealing with a charterer under a prohibition of lien clause.

MCT argues that under Canadian law, Empire has the burden of showing an actual contract with the vessel owner before an *in rem* right against the vessel arises. MCT contends that Empire failed to prove such a contract between Empire and the record or disponent owner and thus Empire has no right *in rem* against the KOH EUN.

Both Empire and MCT rely on the same Canadian authorities, which the Court finds is the applicable law, for their positions. The first of these cases is *Westcan Stevedoring Ltd. v. The ARMAR* [1973] Can. Fed.Ct. 1232 (1973). In *ARMAR* a stevedoring company sued the vessel owner *in rem* to recover monies representing charges for stevedoring services provided the vessel while the vessel was under a time charter to a Cuban organization.

Initially, the *ARMAR* court relied on prior case law for the proposition that necessaries supplied to a vessel are prima facie presumed to have been supplied on the credit of the ship, but added that that presumption may be rebutted. Plaintiff stevedoring company admitted that it had relied on the credit of time charterer rather than the vessel owner. Nevertheless, plaintiff argued that the services were in reality for the benefit of the vessel or the economic success of the voyage and thus, plaintiff should be able to pursue the owner for the value of those services. In effect, the plaintiff would hold the presumption that necessary services are supplied on the credit of the vessel irrebuttable. The court held this to be too broad a proposition in light of situations wherein there are sound business

reasons to look to the credit of others rather than that of the owner.

Secondly, the plaintiff in *ARMAR* argued that Canadian statutes create a liability *in rem* on the vessel and its owners regardless of what the *in personam* liability might be. The court held that the legislature, by enacting statutes permitting *in rem* enforcement of *in personam* liability, did not intend to create any new liability on the vessel or owner which did not exist prior to the passage of those statutes. The effect of these statutes was to give the right to enforce a liability in an *in rem* proceeding when there is personal liability on the vessel or owner. However, when there is otherwise no liability of a vessel or owner, the statute does not give a right to impose a liability *in rem*.

In the second major case relied upon by both MCT and Empire, *Shell Oil Co. v. The LASTRIGONI*, 3 Austl.Argus L.R. 399 (High Court of Australia 1974), the supplier furnished fuel bunkers for a vessel under a time charter. The contract under which the bunkers were supplied was between an agent for the time charterer and the plaintiff supplier. The owner of the vessel was not a party to that contract and had no contractual liability to the supplier. The supplier, however, argued that the supply of fuel itself created a maritime lien to which the ship was subject and which was enforceable *in rem*. The court held that no maritime lien attached to the vessel. The court also held that supplying necessaries to a ship, under Canadian statutes granting jurisdiction to the High Court of Admiralty for claims or demands for necessaries supplied to a ship, does not cover suits where a supplying is pursuant to contract with a person who represents a charter and who does not represent the ship.

■ Upon a close reading of *Shell Oil* and *ARMAR* and cases cited with approval therein, this Court finds Canadian law to be as follows. There is a rebuttable presumption that necessaries supplied to a ship were supplied on the credit of the vessel. When that presumption is rebutted, as in *ARMAR* and *Shell Oil*, the supplier cannot proceed *in rem* against the vessel or owner because the

facts proved in rebuttal must necessarily show that the supplier relied on the credit of the person ordering the supplies. However, where that presumption is not rebutted, the supplier can proceed *in rem* against the vessel and its owner because the owner is personally liable (the supplier not having been shown to have relied on the credit of other than the owner or the ship). Only by this interpretation can the holdings of the two main cases be reconciled with the presumption that services are supplied on the credit of the vessel thereby making the owner personally liable.

In the absence of evidence to the contrary, the presumption alone is sufficient to charge the vessel and its owner with personal liability which under Canadian statutes can be enforced *in rem*.

Under the evidence in the present dispute, the Court finds as a fact that Empire is entitled to the presumption that stevedoring services provided by it were for the benefit, and supplied on the credit of the vessel owner, disponent or actual, MCT or Sam Ick, the presumption not having been rebutted. Therefore, the Court finds that Empire has a maritime lien on the vessel KOH EUN, enforceable *in rem*, in the amount of $21,415.64 for stevedoring services at Montreal.

### Ramsay's Claim of Lien

Under normal circumstances, the provision of stevedoring services to a vessel creates a maritime lien on that vessel in favor of the provider of the services. *See, e. g., International Terminal Operating Co. v. S. S. VALMAS*, 375 F.2d 586 (4th Cir. 1967). Similarly, the services and disbursements of a special agent in attending to the details of getting a vessel in and out of port result in a maritime lien. *P. T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T. S. Salzachtal*, 373 F.Supp. 267 (E.D.N.Y.1974); *The ODYSSEUS III*, 77 F.Supp. 297 (S.D. Fla.1948); *see* 2 Benedict on Admiralty § 33, p. 3–17. Thus, given only the undisputed facts that Ramsay provided stevedoring services to the KOH EUN at Baltimore and stevedoring and agency services in Norfolk, Ramsay would have a valid maritime lien for the value of those services and disbursements.

MCT, however, on behalf of the vessel raises two defenses to the claims of Ramsay. MCT contends that the lien is barred by a "prohibition of liens" clause in the MCT–IROSCO charter; or, failing that, MCT argues that Ramsay waived any lien to which it normally would have been entitled.

Prior to the arrival of the KOH EUN at Baltimore, JOIST and IROSCO separately built up substantial debts to Ramsay for various services to other vessels, in combination totaling in excess of $100,000. Ramsay looked to the coordinating agent IMPACT to work out some arrangement to satisfy those past debts. Levering, president of Ramsay, met with Erik Murer and Frank Franco, respectively president and vice-president of IMPACT, and set up a schedule of payments through IMPACT to Ramsay to satisfy those previous obligations. Apparently, however, only one of the scheduled payments was made.

In November, subsequent to Ramsay's stevedoring the KOH EUN at Baltimore, Peralta (general agent for IROSCO) telexed Ramsay informing Ramsay that IROSCO was assigning to Ramsay Baltimore freights due the KOH EUN as an advance for stevedoring services. Similarly, Peralta telexed Ramsay while the KOH EUN was at Norfolk assigning Norfolk freights as an advance payment for stevedoring the vessel at Norfolk. Not surprisingly, Hamilton, vice-president of Ramsay, testified that he and Ramsay's president decided to work the vessel not because of the assignments but because Ramsay knew it could fall back on the security of the vessel itself. In addition, during the loading of the KOH EUN, U.S.A. Steamship (agent of MCT) contacted Ramsay and ordered Ramsay to cease loading the vessel since MCT had not been paid its charter hire by IROSCO. At that point, Ramsay indicated to U.S.A. that Ramsay might attach the KOH EUN because of IROSCO's debt to Ramsay but either was

dissuaded to do so by MCT or unilaterally decided not to attach at that time. The following day U.S.A. again contacted Ramsay and instructed Ramsay to recommence loading the vessel as its principal (MCT) had then been paid.

MCT first contends that a prohibition of lien clause in the charter party between MCT and IROSCO bars any lien for necessary services asserted by Ramsay. The applicable provision in that charter is the standard prohibition of lien clause found in the New York Produce Exchange Form. Ramsay argues that since it had no knowledge of such a clause, the contractual provision between MCT and IROSCO was not effective against Ramsay.

The resolution of this issue depends upon an interpretation of the effects of the 1971 Amendments to 46 U.S.C. § 973.

Prior to 1971, as a result of the Maritime Lien Act of 1910, the law of materialmen's maritime liens authorized the assertion of a maritime lien against a chartered vessel when the services supplied to the vessel were requested by one with apparent authority. *See* 46 U.S.C. § 973 (1970). The statute, however, included the language that:

> nothing in this section shall be construed to confer a lien when the furnisher knew or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.

*See* [1971] U.S.Code Cong. & Admin.News, pp. 1363, 1366. As developed by case law that duty of inquiry provision almost always prevented a maritime lien from attaching, the duty to inquire becoming "all but absolute." *Lake Union Drydock Co. v. M/V POLAR VIKING,* 446 F.Supp. 1286 (W.D.Wash.1978), *quoting,* Gilmore & Black, The Law of Admiralty 674 (2d ed. 1975).

In 1971, Congress deleted the above-quoted portion of the statute. MCT argues that the deletion reinstates the law as it existed prior to the 1910 Act. Accordingly, MCT contends that a supplier that neither knows nor has reason to know that it was dealing with a chartered vessel, rather than an owner, is entitled to rely on the presumption of authority to order such necessaries as provided in 46 U.S.C. § 972. However, MCT contends that if, under all the circumstances, the supplier has reason to know that the vessel is chartered and makes no further inquiry, a prohibition of lien clause in the charter is effective to bar a lien. Ramsay counters by suggesting that even assuming the general efficacy of the prohibition of lien clause between MCT and IROSCO, the effect of the 1971 Amendments was to eliminate any duty to inquire into the terms of a charter and permit a supplier to obtain a lien despite such a provision.

Somewhat surprisingly, case law interpreting the 1971 amendments is sparse. Nevertheless, in a case closely analogous to the present suit, the court held that after the 1971 Amendments the statute gives a materialman a maritime lien for necessaries unless he has actual knowledge that the vessel is operating under a charter which contains a no-lien provision. *Lake Union Drydock Co. v. M/V POLAR VIKING,* 446 F.Supp. 1286 (W.D.Wash.1978). The court continued that the assertion of the lien is barred only if the materialman has actual knowledge of the no-lien clause. *Id.* at 1291. Similar interpretations of the effect of the 1971 Amendments were reached by two other courts that have considered the matter. *See Nacirema Operating Co. v. S. S. AL KULSUM,* 407 F.Supp. 1222 (S.D.N.Y.1975); *John T. Clark & Son of Boston, Inc. v. Neris Shipping Co.,* 1974 A.M.C. 1489 (S.D.N.Y.1974). It is true, however, as suggested by MCT, that those cases involved suppliers which had no knowledge of any charter arrangement. MCT argues, therefore, that those cases are inapplicable here since in the present dispute Ramsay knew that it was dealing with IROSCO as a charterer rather than as an owner.

█ Nevertheless, viewing the legislative history of the 1971 Amendments as a whole in light of industry practices prior to

the amendments, this Court is of the opinion that the reasoning of the *Lake Union* court is correct. *See* 2 Benedict on Admiralty § 38, at p. 3–41. *See also* [1971] U.S.Code Cong. & Admin.News, pp. 1363–68. The Court finds the post-1971 law to be as follows: The supplier of necessities to a vessel has no duty of inquiry as to the existence of a charter or a prohibition of lien clause in a known charter. The supplier is entitled to rely on the statutory presumption of 46 U.S.C. § 971 *et seq.* Any prohibition of lien clause is thus ineffective against such a supplier of necessaries absent actual knowledge of a charter including a prohibition of lien clause. Knowledge of a charter alone does not bar a lien. It appears from the evidence in this dispute that while Ramsay surely had knowledge of the fact that IROSCO was merely a charterer rather than an owner of the KOH EUN, Ramsay did not have actual notice of the prohibition of lien clause in the MCT–IROSCO charter. Therefore, the Court finds that the maritime lien for stevedoring and agency services provided the KOH EUN is not barred by the provisions of the MCT–IROSCO charter.

MCT next argues that even if the prohibition of lien clause is not effective as to any lien by Ramsay, the actions of Ramsay in taking an assignment of freights in Baltimore and in Norfolk constituted a waiver of any statutory lien to which it was otherwise entitled.

 There is no doubt that the statutory lien to which a supplier of necessaries is entitled may be waived. 46 U.S.C. § 974. Further, it is clear that the burden of proving a waiver is on the party attacking the lien and this burden must be met by clear and affirmative proof. *See, e. g., Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861 (5th Cir. 1958); *The MARSODAK*, 94 F.2d 339 (4th Cir. 1938); *Nacirema Operating Co. v. S. S. AL KULSUM*, 407 F.Supp. 1222 (S.D.N.Y.1975). While the intention of the parties is controlling, absent an express waiver of lien there is no single occurrence or factor that in itself establishes a waiver. *See* cases collected in 2 Benedict on Admiralty § 61, at pp. 5–4 to 5–5.

 MCT contends that by taking an assignment of freights due the KOH EUN at Baltimore and Norfolk, Ramsay looked beyond the credit of the vessel and thus waived its lien. MCT suggests this reasoning is especially persuasive as to the events in Norfolk where the assignment of freight occurred prior to Ramsay's working the vessel. Nevertheless, Ramsay is entitled to the presumption that necessary services were supplied on the credit of the vessel. *See* 46 U.S.C. § 971; *Jones Tug & Barge Co. v. S. S. LIBERTY MANUFACTURER*, 1978 A.M.C. 1183 (C.D.Cal.1976).

 While MCT's proof of the assignments by itself might be indicative of an intention by Ramsay to look beyond the credit of the vessel, a supplier of necessaries is entitled to look to the credit both of the vessel and the vessel owner without waiving its lien. *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920); *accord The STJERNEBORG*, 106 F.2d 896 (9th Cir. 1939), *aff'd sub nom., Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of Cal.*, 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940). Given the substantial debt owed Ramsay by IROSCO for past services and Ramsay's knowledge that IROSCO might have been in financial straits in general, the taking of the assignments of freights by Ramsay is equally consistent with an intention to obtain additional assurances of payment for both past and current service charges as with an intention to waive its lien. Thus, the Court finds from all the evidence that MCT has not met its burden and that Ramsay did not waive its lien against the KOH EUN.

### Bill of Lading; Garnishment

As noted above, prior to the arrival of the KOH EUN in Norfolk both JOIST and IROSCO owed substantial debts to Ramsay for services to other vessels. When the KOH EUN arrived in Norfolk, a cargo of Griffin Pipe was on the pier. The freight

forwarder Schade prepared a JOIST bill of lading for the pipe cargo to be loaded aboard the IROSCO chartered KOH EUN which Ramsay endorsed on November 14, 1977, as "received for shipment." There is some question as to whether the bill was prematurely stamped as an "on board" bill on November 14, but at any rate, the cargo was not fully loaded until five days later on November 19.

During the loading of the KOH EUN on November 18, Ramsay sued IROSCO, JOIST, IMPACT and Schade as garnishee for past debts owed to Ramsay. At that time Schade held the prepaid freights for the Griffin Pipe cargo in the amount of $104,892.25. Without order of court, Schade paid the freight monies to Ramsay after deducting $15,252.24 in commission fees owed to Schade by IROSCO and JOIST for services to the KOH EUN and previous unrelated vessels. Following that payment, Ramsay voluntarily dismissed the garnishment action. Upon receipt of those funds, Ramsay credited the $89,640.01 ($104,892.25 less $15,252.24) to its JOIST account for past services to that charterer. On November 19, the KOH EUN, worked by Ramsay was fully loaded. Two days later on November 21, Ramsay mailed to Schade the JOIST bill of lading covering the pipe cargo.

On December 5, IROSCO abandoned the voyage and MCT stepped in and completed the voyage to the Middle East. Under the operation of MCT, the KOH EUN sailed from Norfolk with the JOIST bill of lading covering the Griffin Pipe cargo on December 14.

Both MCT and Ramsay raise a number of arguments relating to: the propriety and effect of the issuance by Ramsay of a JOIST bill of lading for cargo to be carried by an IROSCO vessel; the propriety and effect of the garnishment suit and payment of prepaid freights by Schade to Ramsay without a court order; and the actual carriage of the pipe cargo under the JOIST bill of lading on the KOH EUN under MCT control.

Rather than setting out in detail the arguments and counter-arguments of MCT, Ramsay and Schade point-by-point as contained in their lengthy post-trial briefs, the Court will set out its factual findings and their legal effect and make appropriate reference to the parties' contentions.

■ Whatever its motivation was to issue a JOIST bill of lading for the pipe cargo, it is clear from the evidence that Ramsay knew the pipe would be carried by an IROSCO rather than a JOIST vessel and that Ramsay should have signed an IROSCO bill. Nevertheless, the actual carriage of the cargo by the KOH EUN would entitle the vessel operator to the prepaid freight notwithstanding the improper JOIST bill of lading. *Marine Traders, Inc. v. Seasons Navigation Corp.*, 422 F.2d 804 (2d Cir. 1970). Thus, the freights received from Schade should have been credited to the IROSCO rather than the JOIST account.

It is also clear that Schade as forwarder knew or should have known that the KOH EUN was an IROSCO vessel. *See* 46 C.F.R. § 510.23(d). Moreover, under Rule B(3)(a) of the Federal Supplemental Rules for Certain Admiralty and Maritime Claims, Schade should not have paid the freights to Ramsay but should have admitted that it held the prepaid freights and either paid those funds into court or simply held them.

Underlying all of this, three facts seem paramount to the resolution of the variety of legal contentions offered in this case. First, eventually MCT sailed the KOH EUN from Norfolk with the Griffin Pipe cargo under the JOIST bill of lading. Second, Ramsay was acting not only as an independent contractor in providing stevedoring services to the KOH EUN in Norfolk but also as an agent for IROSCO. Similarly, as freight forwarder Schade acted not only for the shipper but also on behalf of the carrier in getting cargo for the ship.

■ It is the opinion of this Court that when IROSCO abandoned and MCT took over the voyage and sailed the KOH EUN with the improper JOIST bill of lading, it adopted or ratified the prior actions of

Ramsay and Schade in the issuance of the JOIST bill. Upon taking over the voyage, MCT on December 5, acting both as disponent owner and operator of KOH EUN, could have refused to carry the cargo under the JOIST bill. This is especially apparent in light of the fact that on a previous occasion an improper JOIST bill of lading for cargo to be carried on the IROSCO vessel HARGOBIND was changed to an IROSCO bill prior to the vessel's sailing. Nevertheless, this action (or inaction with regard to the improper bill) must be viewed in connection with Ramsay's position on this particular voyage as agent for IROSCO.

As is any agent, Ramsay was obligated not to act adversely to the interests of its principal. As noted above, there is no question that Ramsay knew that the KOH EUN was an IROSCO vessel and would carry the pipe cargo. While Ramsay had a right to try to collect debts owed to it by IROSCO, JOIST or IMPACT, Ramsay had a concurrent obligation not to impose any barrier to the voyage of its principal's (IROSCO) vessel. Ramsay received funds from Schade which it knew were properly owing to IROSCO. Thus, Ramsay had the right to apply those funds to the charges for stevedoring and agency services and advances provided in Baltimore and Norfolk for this voyage. Ramsay, however, did not have the right to apply those funds to debts of JOIST nor did it have the right to apply those funds to the past debts of IROSCO since exhausting the prepaid freights for the pipe cargo and then attaching the vessel for current stevedoring charges would improperly impede the voyage of its principal's vessel.

Similarly, Schade as freight forwarder owed some obligation to the carrier for whom it solicited cargo. *See* 46 C.F.R. § 510.23(d). Schade does not dispute that its payment of the Griffin prepaid freights to Ramsay was not proper but argues that the forwarding of the freights was understandable since Ramsay was acting as agent for both JOIST and IROSCO. While Schade's actions may have been understandable, its deduction of commission fees raises problems. As noted above, Schade knew or should have known that the Griffin cargo would be carried on IROSCO's KOH EUN. Thus, while payment of the $89,640.01 went to IROSCO's agent, Schade's retention of the commissions due from JOIST to Schade (for services rendered by Schade to JOIST vessels) was improper. Schade argues that it was a common practice in the industry for forwarders to deduct their charges before remitting freights to the carriers and that it had permission to do so. However, that permission came from JOIST and not IROSCO. As the evidence was clear that it was indeed a common practice in the industry for forwarders to deduct charges for past services before sending freight money to the carriers, it would seem proper that Schade could withhold the charges for the KOH EUN from the Griffin freights. In addition, since a freight forwarder is an independent contractor rather than an agent for the carrier, Schade also should be permitted to withhold charges for prior IROSCO but not for prior JOIST vessels.[1]

### Services While Vessel in Custodia Legis

The KOH EUN was attached by Ramsay on November 18, 1977. It is undisputed that subsequent to the attachment Ramsay continued to provide services to the vessel in the amount of $11,848.35 for which Ramsay has not been paid. MCT would have that amount disallowed to Ramsay as part of its lien for servicing the KOH EUN under the general principle of admiralty that claims for services without court order during a *custodia legis* period are not enti-

---

1. Notwithstanding minor mathematical errors by Schade, Schade withheld a total of $15,252.24 from the prepaid freights. Schade's letter to Ramsay remitting the remainder of the prepaid freights indicates Schade withheld brokerage fees for services to the following IROSCO vessels: HARGOBIND ($5,609.32); KOH EUN ($4,195.69); and KOH EUN ($2,179.06). Schade also withheld funds for the JOIST vessel CAMARA ($3,268.17). Thus, Schade improperly withheld $3,268.17 properly due IROSCO to which MCT is now subrogated. *Cf. American Steel Barge Co. v. Chesapeake & Ohio Coal Agency*, 115 F. 669 (1st Cir. 1902).

tled to lien status and are barred in an *in rem* action. *The COMMACK*, 8 F.2d 151 (S.D.Fla.1925); *PYNE v. Oil Screw F/V CHRISWAY*, 298 F.Supp. 1160 (S.D.Ga. 1969).

Nevertheless, as argued by Ramsay, there are numerous exceptions to the general rule and a district court has the equitable power to allow claims during the course of an attachment. *See P. T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T. S. Salzachtal*, 373 F.Supp. 267, 284 (E.D. N.Y.1974), and cases cited therein. Inasmuch as Ramsay's services following the attachment were rendered with the full knowledge and consent of MCT and more important since a good portion of those services were at the request of MCT and for its benefit, the Court in its discretion finds those charges should be properly allowed as part of Ramsay's lien on the vessel.

### MCT Claim of Lien

As noted above, the IROSCO vessel KOH EUN performed the actual carriage of the Griffin pipe at which time MCT had stepped in to complete the voyage. MCT claims a lien on the prepaid freight under clause 18 of the MCT–IROSCO charter. While Ramsay raises several arguments to defeat MCT's contractual claim of lien for unpaid charter hire, it is not necessary to decide those issues. Any lien by MCT for unpaid charter hire would be deemed to take the date of the charter (October, 1978). The rule is clear in admiralty that liens established by contract have priority in inverse chronological order for obvious reasons of business necessity. *The ST. PAUL*, 277 F. 99, 109 (S.D.N.Y.1921), 2 Benedict on Admiralty § 51, at p. 4–4. Thus, any lien by MCT for unpaid charter hire would rank behind Ramsay's and Empire's liens for stevedoring services.

### Priorities

The final issue of the priority between the liens of Empire and Ramsay that the Court has held to be valid is straightforward. All service liens which accrue in connection with a voyage have equal priority. *See* 2 Benedict on Admiralty § 51, at pp. 4–4 *et seq*. The evidence is clear that the services provided both by Empire and Ramsay involved a single voyage and thus their liens are of equal rank.

Based on the foregoing, the Court enters the following judgment and order. As detailed in an Appendix to this opinion, Ramsay's total charges for stevedoring and agency services to the KOH EUN in Baltimore and Norfolk, plus the costs of attaching the vessel, minus funds already paid or stipulated as owing from U.S.A. Steamship Company or Ramsay, amount to $96,074.01. The Court ORDERS that the $89,640.01 representing prepaid freight for the Griffin Pipe cargo remitted to Ramsay by Schade be credited by Ramsay to the account of IROSCO for services rendered to the KOH EUN. This credit will leave an unpaid balance of $6,434.00 owing to Ramsay for services to that vessel and the Court enters judgment for Ramsay against the KOH EUN *in rem* for $6,434.00. As MCT has filed a Stipulation for Value with this Court in order to release the KOH EUN, it is ORDERED that the judgment *in rem* on behalf of Ramsay be satisfied from the funds provided under such stipulation.

Empire's total charges for stevedoring the KOH EUN in Montreal amount to $21,415.64, which amount increased by $1,000.00 paid to Ramsay toward the costs of attaching the vessel totals $22,415.64. The Court enters judgment in favor of Empire in the amount of $22,415.64 against the KOH EUN *in rem* and ORDERS such amount be paid from the funds provided under MCT's stipulation for value.

Finally, the Court enters judgment in favor of MCT against Schade in the amount of $3,268.17 for funds wrongfully withheld by Schade from the Griffin pipe prepaid freight.

## APPENDIX

Ramsay Charges for Services to KOH EUN

| | | | | |
|---|---|---|---|---|
| Baltimore Stevedoring | | 29,519.37 | | |
| Norfolk Stevedoring | | 43,788.33 | | |
| Norfolk Agency | 30,653.16 | | | |
| Less amount paid by U.S.A. Steamship Co. | [7,000.00] | | | |
| Less amount stipulated as owing from U.S.A. Steamship Co. | [1,058.98] | | | |
| | | 22,594.18 | | |
| | | | 95,901.88 | |
| Cost of Attachment | 5,003.88 | | | |
| Less amount paid by Empire | [1,000.00] | | | |
| | | | 4,003.88 | |
| Less amount received in freight monies under IROSCO bill of lading for unrelated cargo aboard KOH EUN | | | [3,831.75] | |
| | | | | 96,074.01 |
| Less credit to IROSCO account for freight monies received from Schade | | | | [89,640.01] |
| Balance due and owing Ramsay for services to KOH EUN | | | | 6,434.00 |